UNION WATER POWER COMPANY *vs.* INHABITANTS OF LEWISTON.

Androscoggin.　Opinion September 17, 1906.

*Water Contract.　Grant of Water Rights.　Construction of Such Grants.　Dispropor-*
*tionateness of Consideration.　Conflicting Intentions.　Habendum Clause,*
*Effect of.　Words and Phrases.　Actions of Tort, Not Obligatory*
*to　Add　Interest　to　Damages.　Evidence.　Private and*
*Special Laws, 1875, c. 107.*

1.　The owner of a dam lawfully maintained across a river to raise a head of
water for generating power has the exclusive right to the use of such head
for that purpose, though not for other purposes.

2.　The right of any other person to draw water from a lawful dam for power
purposes is derived solely from grant, and is defined and limited by the
terms of the grant.

3.　In construing written instruments of grant it should be assumed, unless
the language used clearly indicates the contrary, that the purpose of the
parties in reducing the terms to writing was to avoid future litigation by
leaving as little as possible indeterminate.　So far as the language is sus-
ceptible of such meaning it should be so construed.

4.　The rule that when the language of a grant is susceptible of more than
one meaning, that meaning should be adopted which is most favorable to
the grantee, has less force, even if applicable, where the instrument of
grant is in the form of an indenture signed by both parties and follows the
language of a prior written contract agreed to by them.　In such case the
language of the grant is selected by the grantee as well as by the grantor.

5.　While disproportionateness of consideration may be reason for reforming
or cancelling an instrument of grant, it has little, if any, effect upon the
meaning of the words of the grant.

6.　When one intention appears in one clause in an instrument, and a differ-
ent, conflicting intention appears in another clause in the same instrument,
that intention should be given effect which appears in the principal or
more important clause.

7.　While the habendum clause in an instrument of grant may sometimes
enlarge the estate in the thing granted, it cannot enlarge the thing itself.

8.　A particular word, phrase, or term may express a meaning different from
its common meaning when used in instruments concerning a subject mat
ter in relation to which such different meaning is generally understood
and accepted.

9.　In actions of tort, it is not obligatory upon the court or jury in assessing
damages to add interest from the time of the injury.

10. The Franklin Company, the then owner of a dam lawfully maintained across the Androscoggin River at Lewiston for raising a head of water for generating power, granted by an instrument of indenture to the City of Lewiston the right to draw from its dam "Water to the extent of 600 horse power for the purpose of pumping" &c., (the head of water being fixed at not less than 25 feet nor more than 30 feet.)  After full consideration of the subject matter of the grant, the situation, the history and character of the negotiations, and all the language used by the parties in the instrument finally signed by them as defining their rights and obligations thereunder, *Held:*

  a. The grant is not of water power, but only of water for power, and the city is entitled, not to a certain quantity of power, but only to draw a certain fixed quantity of water from which to extract as much power as it may by its own agents and appliances.

  b. From the evidence and the admissions of the plaintiff it appears that the phrase " to the extent of 600 horse power" means in its connection, efficient, practical horse power upon a well understood and recognized basis of seventy-five per cent of efficiency, and hence the city is entitled to draw for pumping purposes water to the extent of 800 nominal or theoretical horse power and no more.

  c. It appears from the evidence that the city has been drawing water in excess of its right under the grant, and that the value of such excess drawn for six years next before the date of the writ is $3468.55.

  d. As the city seems to have drawn the excess under a claim of right made in good faith no interest should be allowed before the date of the writ.

On report.   Judgment for plaintiff.

Action on the case against the defendant city to recover damages for diverting and drawing more water from the plaintiff company's dam for power purposes than the defendant city is entitled to draw for such purposes.

The declaration in the plaintiff's writ is as follows:

"In a plea of the case, for that the plaintiff, on the fifth day of November, 1878, was and ever since, down to the present time, has been and now is the owner of certain stone dams across the Androscoggin River, at the head of the falls on said river between Lewiston and Auburn and of the land on both sides of said river where said dams are located and along both sides of said river above said dams, and also of the right to hold and store, by means of said dams and the flashboards thereon, the waters flowing in said river, to the height to which the same can be held, retained and stored by means of said dams and flashboards for the purpose of creating and maintaining a

mill pond above said dams; and also of a certain mill pond and maintaining a mill pond above said dams; and of certain lands with the buildings, gatehouses, gates and other structures therein at the outlet of said mill pond, maintained and used for the purpose of controlling and letting out the waters from said mill pond and river; and also of certain canals in said Lewiston, by means of which the waters from said river and mill pond are supplied by the plaintiff through said gates and canals, to mills and factories in said Lewiston, located on said canals, for use for power purposes.

"And the plaintiff avers that by virtue of a certain lease or conveyance between the Franklin Company and said defendant, duly made and executed between said Franklin Company and said defendant, dated the fifth day of November, 1877, said Franklin Company did thereby and therein demise, let and lease unto said defendant as appurtenant to a lot of land owned by said defendant and known as the pumping station lot, the right, privilege and easement of drawing from said Androscoggin River and the mill pond above said dam in said Lewiston, water to the extent of 600 H. P. for the uses and purposes specified and defined in said lease or conveyance.

"And the plaintiff further avers that it now and during all the time aforesaid has owned, exercised and used the right to hold, store, manage and control, by means of said dams, flashboards and gates, the waters of said Androscoggin River, flowing into said mill pond and to draw off the same from time to time to supply the mills and factories in said Lewiston upon said canals with power to run and operate their machinery and to sell and dispose of the water so held and stored by it for power purposes and for which it receives compensation from said mills and other persons to whom it sells and disposes of said water for power purposes, and being so seized of said premises and appurtenances, water rights, water power and privileges, the defendant, knowingly and with intent to wrong and injure the plaintiff and to deprive it of the use and benefit of said premises and appurtenances, water rights, water power and privileges and the sale and use of the waters of said river as above set forth, and without any authority or right so to do, at said Lewiston, on the first day of December, 1893, and on divers other days and times between the

time aforesaid and the day of suing out this writ, by means of a certain covered canal leading from a point on the banks of the mill pond aforesaid, above dam No. 4, in said Lewiston and across the plaintiff's land to the pumping station lot, so called, belonging to the said defendant, did draw and divert during all the time aforesaid and still does draw and divert great quantities of water from said river and mill pond aforesaid, in excess of the 600 H. P. leased and conveyed under said lease or conveyance of November 5, 1877, and by means of gates and other structures belonging to said defendant and situated wholly upon said pumping station lot, and controlled and operated by the servants and agents of said defendant, does discharge the water so unlawfully drawn and diverted by it as aforesaid, into the Androscoggin River below the plaintiff's dams, so that all use, benefit and enjoyment of the water so drawn, diverted and discharged is lost to the plaintiff and its supply of water in said Androscoggin River and said mill pond is depleted and greatly diminished thereby.

"And the plaintiff avers that said defendant has no lawful right to draw and divert the water as aforesaid from said river and from said mill pond of the plaintiff in excess of 600 H. P. in the manner above set forth and described, and that by reason of such unlawful drawing and diversion of said water as aforesaid, the plaintiff is deprived of the natural flow of the same and of the use, enjoyment and benefit of the same in supplying the mills and factories of the income and profit which it is of right entitled to receive and have from the use and sale thereof—to the damage of the said plaintiff (as it says), the sum of ten thousand dollars."

Plea, the general issue, with the following brief statement:

"And for a brief statement of special matter of defense to be used under the general issue above pleaded, the said defendant further says:

"(1)  That the defendant had license and authority to do all acts in the using of water set out in the plaintiff's writ.

"(2)  That whatever water was used in conformity with authority granted by the plaintiff's predecessor in title and right, the Franklin Company and by mutual agreement between the parties, and by lease and other writings between the parties.

"(3)   That whatever water was used was for the purpose of carrying out the agreement between the parties whereby the sum of $200,000 was paid for such use, and the same was in conformity with the spirit and intent of such agreement, or lease, or both, and other deeds or writings, and the votes of the City and the City Council, and Water Board.

"(4)   Defendant will rely upon the statute of limitations to any claim the plaintiff. may have set out in its writ and declaration."

Tried at the April term, 1905, of the Supreme Judicial Court, Androscoggin County.   After the .evidence had been taken out, it was agreed to. report the case to the Law Court with the stipulation that "upon so much of the foregoing evidence as is legally admissible and competent" the said "Law Court to render such judgment as the rights of the parties require."

The case appears in the opinion.

*White & Carter*, for plaintiff.

*Foster & Foster and George S. McCarty*, for defendant city.

Sitting:  Wiswell, C. J., Emery, Whitehouse, Savage, Powers, Spear, JJ., Wiswell, C. J., concurring in the result.

Emery, J.   This action is for drawing more water from the plaintiff company's dam for power purposes than it concedes the defendant city is entitled to draw for those purposes.   We have no occasion to enter upon any inquiry as to either party's legal .rights to the water apart from the terms of a grant by written indenture made to the city by the plaintiff's predecessor in title, since for reasons hereinafter stated the amount of water the city is entitled to draw for power is fixed and limited by the terms of that indenture. The problem, therefore, is to ascertain what amount of water is named or specified in that indenture for the city to draw for power purposes.

It is sometimes said that the problem in such cases is to ascertain the intention of the parties, or what the parties meant by the language named.   This is hardly accurate, for sometimes, as was not improbable in this case, when the parties have agreed upon the language of

their contract they may have each a different understanding of the
meaning of that language. The real problem is to ascertain what
meaning the language itself gives out, what intention or purpose is
expressed by the words and phrases used. It is that meaning by
which the parties are bound, even though one or the other honestly
believed the language to have a different meaning.

Words and phrases, spoken or written, usually have a common,
uniform meaning understood by speaker and hearer, or writer and
reader, alike. It is this consensus of understanding that makes
social and business intercourse possible. When, therefore, the words
and phrases used by the parties are known, they are usually to have
effect according to this common meaning, whatever either party may
have supposed they meant. But while this is generally true, it is
not universally true. The same word or phrase may have different
meanings in different instruments and in different contexts in the
same instrument. It may have different meanings as applied to dif-
ferent subject matters and also in different situations of the same
subject matter. So its common meaning may be overborne by other
words or phrases in the same instrument. Hence it is not enough to
read only the specific words or phrases in which the grant in this
case was made. The then situation and prior rights of the parties,
the nature and situation of the subject matter, the object or purpose
of the parties in making the contract, or in putting its terms in writ-
ing, are to be learned, and the whole contract or instrument is to be
studied, to ascertain how far the common meaning of the particular
words or phrases is modified by surrounding circumstances and by
other words and phrases in the same instrument. All these have
been done in this case. But, after all, the problem still is to ascertain
the real meaning of the words used, the purpose or intention
expressed by those words, for they must be presumed to express
what the parties had in mind.

In this case the situation and circumstances are as follows: As
early as 1875 the Franklin Company (the predecessor in title of the
present plaintiff, the Union Water Power Company) owned and law-
fully maintained a dam across the Androscoggin River at Lewiston
Falls to raise and store a head of water for generating power. While

the company did not own the water thus stored and even was obliged
to submit to its use for some purposes by others and the public and
was obliged ultimately to let it flow to riparian owners below, the
company did own exclusively the use of the water for generating
power at that place except so far as granted to others.   No other
party could lawfully divert a gallon of that water for that purpose
without the consent of the company.   The water for such use could
be granted or leased in whole, or in part, or divided and distributed
in such manner and upon such terms and conditions as the company
saw fit except so far as limited by prior grants.   *Butman* v. *Hussey*,
12 Maine, 407; *Matteson* v. *Wilbur*, 11 R. I. 546; *Green Bay Co.*
v. *Kaukauna Co.*, 112 Wis. 323. (87 N. W. 964.).

In 1875, by chap. 107 of the Special Laws of that year, the City
of Lewiston was authorized to establish and operate a system of
municipal water works to supply itself and its citizens with water for
domestic and other purposes, and to take such water from the Andro-
scoggin River.   The difference in level was so great that it was to the
evident advantage of the city to take this water from some part of
the river above the dam instead of below it.   Negotiations were soon
afterward begun between the company and the city as to the terms
and conditions on which the company would consent to the city's
taking water from above the dam for distribution for the purposes
named in the statute cited, and also other water for propelling the
necessary pumps and other machinery of the water works plant to
be established by the city under the statute.   The company made
certain tentative propositions.   Amendments were proposed by the
committee on the part of the city which were accepted.   Later, in
August, 1877, a formal written instrument was executed by the
officers of the company and those of the city as expressing the terms
agreed upon by the two parties.   This instrument covered the quan-
tity of water to be taken from above the dam for distribution under
the statute, the quantity of water to be taken for propelling the
city's pumps and machinery, and the terms and conditions under
which each portion of water was to be taken.   It also provided that
the company should convey to the city a small lot of land near and
just below its dam upon which the city could (and afterwards did)

locate and construct the necessary canals, structures, water wheels and machinery for pumping purposes. Further provision was also made that the company should take certain measures to secure an increased supply of water at its dam for the use of the city and for the benefit of manufacturing establishments in the city. In the amendments proposed by the city to the company's proposals, this latter provision was asked "for the promotion of the general interests of the city." The price to be paid by the city for all this was the lump sum of $200,000 for all time.

Subsequently various large manufacturing corporations, which had prior grants of water from the company's dam and pond, executed to the city a written waiver of all priority of right to use the water over the right to be granted to the city under the above named instrument.

Finally, by deed dated Nov. 5, 1877, the Franklin Company conveyed to the city the lot of land named in the previous contract. It also by indenture of the same date granted to the city in perpetuam the right (as defined in the indenture) to take water from the river above and near its dam and also from Wilson Pond (a tributary above the dam) for distribution as named in the statute; and, as appurtenant to the land conveyed the same day, the right (as defined in the indenture) of drawing other water from above and near the dam for operating its pumping station to be established on that lot. This indenture was signed by the Mayor in behalf of the city, and the indenture and the deed were accepted as those contemplated by the contract of the previous August, and the city paid the $200,000 as stipulated in the contract.

The lot of land conveyed was near but not on the river, the Franklin Company still owning a strip of land between. After the conveyance and indenture were executed the city established its pumping station on this lot, excavated wheel pits and tail race and a canal to lead the water from the dam to the wheels, installed water wheels, pumps, &c., and constructed the necessary flumes, gates, penstocks, racks, &c., for holding, controlling and using the water. When completed, the city began by means of these works to pump water for distribution, at first from the river above the dam but later from

Wilson Pond, and has been doing so ever since.  The amount so pumped has been increasing gradually from year to year with the growth of the city and the new and increasing uses of the water.

The title and rights of the Franklin Company in the dam and water power created thereby, not granted to the city or others, have come to the Union Water Power Company, this plaintiff.  No complaint is made in this suit that the city has been pumping more water for distribution than it has a lawful right to do.  The complaint is only that the city is, and has been for some time, taking more water for power to work its pumps than was granted to it in the indenture of Nov. 5, 1877.

Much was said, in the argument for the city, about the common law and statutory rights of the city to take water from the river and ponds above the dam for distribution  under the enabling statute independent of any grant from the Franklin Company, but as no complaint is yet made of the amount of water taken for those purposes, we have, as already stated, no occasion to consider the source or extent of the city's rights to such water.  But, for reasons stated in the first part of this opinion, the right of the city to take water from the dam for the propulsion of its pumps or other machinery is derived solely from the grant of Nov. 5, 1877, and is measured and limited by the terms of the indenture by which that grant was made. We have, therefore, to address ourselves only to the question what quantity of water to be taken for power was fixed by the terms of that indenture?

In the indenture, after reciting the previous contract and the conveyance of the lot, the parties used this language as to the amount of water to be pumped for distribution, and as to the amount to be drawn for power for such pumping, viz:—

"Now, therefore, in consideration of the premises and the sum of money hereinafter named, the said Franklin Company hath demised, let and leased, and doth hereby demise, let and lease to said City of Lewiston and its successors, the right to take so much water every twenty-four (24) hours, for domestic, fire, mechanical, manufacturing and other purposes, as six hundred (600) horse-power, at a head of twenty-five (25) feet will pump from the Androscoggin River above

the dam, near the Lincoln Mill, so called, in said Lewiston to a height of two hundred and twenty (220) feet twelve (12) hours in such twenty-four (24;) said City of Lewiston and its successors to have the right to pump said above stipulated quantity of water during any part of or all of the twenty-four (24) hours.

.   .   .   .   .   .   .   .   .   .   .   .   .

"And for the same consideration, the said Franklin Company hath demised, let and leased and doth hereby demise, let and lease, to said City of Lewiston and its successors, as appurtenant to the said land conveyed as aforesaid by said Franklin Company to said City of Lewiston, the right, privilege and easement of drawing from said Androscoggin River, above the dam, near the Lincoln Mill, so called, in said Lewiston, water to the extent of six hundred (600) horse power for the purposes of pumping and distributing the water aforesaid from said river ; provided, however, that for said six hundred (600) horse-power, the head shall not be less than twenty-five (25) feet, nor exceed thirty (30) feet."

While the term "horse power" designates a definite amount of mechanical force, it may also, when used in connection with a given head of water, designate a definite quantity of water. Given the head and the mechanical power to be produced in terms of "horse power," the equivalent quantity of water can in theory be ascertained by mathematical calculation. In practice, however, allowance must be made for inevitable leakage, friction and other inevitable losses in converting the water into mechanical force. We find from the evidence that some percentage of allowance for the difference between the theoretical or gross, and the practical or net, is understood in all grants of water for power unless the contrary affirmatively appears. It was admitted at the argument that in the grants by this plaintiff and its predecessors at Lewiston Falls the allowance has been understood, and usually expressed, to be upon a basis of 75 per cent efficiency out of the theoretical 100 per cent. We also find that the plaintiff in presenting to the city its claims for excess of water drawn for power has thus understood and interpreted the grant. We think, therefore, that the language used in the grant does not necessarily limit the city to 600 theoretical horse power,

but that, in its place with reference to the subject matter and attendant circumstances, it fairly imports 600 efficient horse power which of course would require more water than would 600 theoretical horse power. Indeed at the argument the plaintiff's counsel frankly conceded this. In this respect the case is somewhat like the familiar rabbit-warren case, *Smith* v. *Wilson*, 3 B. & Ad. 728, where the word "thousand". as there applied to rabbits, was held to mean one hundred dozen.

It being thus conceded and settled that the language of the grant means efficient horse power, we come to the real controversy in the case. The plaintiff contends that the efficient horse power meant, has a fixed ratio to the theoretical horse power, a ratio fixed by custom and common understanding between vendors and vendees of water power at Lewiston Falls, whatever the amount of net power the vendee may from time to time actually extract from the gross power granted. This fixed ratio of efficiency is 75 per cent as above stated. In other words, the plaintiff's contention is that the grant is of such quantity of water only as at a head of 25 feet will produce 600 net horse power, reckoning the efficiency of the power at 75 per cent. This would be the equivalent of 800 theoretical or gross power.

On the other hand, the city does not contend for any other fixed ratio than the above but denies that any ratio is fixed. It contends that the grant is of such quantity of water as, at the head of 25 feet, shall actually produce from time to time 600 horse power on the shafts of its water wheels, with fairly good water wheels and plant in fairly good condition and operated with due care and skill.

Upon the former theory, the quantity of water that may be drawn from the dam for power is fixed and definite since it can be mathematically computed from the given data. It is only the actual power that the city may from time to time extract from that water that is left indefinite, a matter to be determined by the city itself. Upon the latter theory, the quantity of water to be drawn is left indefinite, varying from time to time with the changes in the efficiency of the water wheels, in the condition of the plant and in the skill and care of operation. Upon the one theory the quantity of water

to be drawn is fixed, not to be exceeded or diminished by either party. Upon the other theory the quantity of water to be drawn is, within limits, such as the city may choose to draw,— less with first class wheels and plant and operation, more with inferior wheels, plant and operation. This variation of efficiency according to the evidence may vary from 45 to 80 per cent. Which of these two theories is supported by the language of the indenture of grant is the question.

Recurring now to the language of that clause containing this specific grant, we think that, taken by itself, it means a fixed, definite quantity of water (to be varied only by a change in the head between 25 and 30 feet) and expressed in terms of horse power, instead of cubic inches or gallons, as is not unusual in grants or leases of water for power. The language is, "the right &c. . . . . of drawing from the Androscoggin River &c. . . . . water to the extent of 600 horse power." . . . . Read by itself, this language does not import a grant of power to be delivered by the grantor on the machinery of the grantee, but does import a grant of water to be drawn and converted into power by the grantee with such wheels and appliances and workmen as he may choose to use. The water is to be drawn by the grantee from and at the grantor's dam, not delivered by the grantor on the grantee's premises and machinery.

This literal meaning does not appear to us to be changed by a consideration of the circumstances under which the indenture was drawn, the purpose of the grant and the purpose of putting its terms in writing, so far as they relate to water for power. At that time water power at Lewiston Falls was valuable and steadily increasing in value. The city officials executing and accepting the indenture had required a contract that the Franklin Company should take measures to increase the supply of water not only for distribution through the city, but also for use as power by then present and future mills in Lewiston "for the promotion of the general interests of the city." (Quotation from the amendment proposed by the city officials to the proposition of the Franklin Company.) An increased demand for water for power was evidently anticipated by both parties up to and even beyond the then capacity of the river and dam. The

various mills already using large quantities of water for power under prior grants had been asked to waive their priority of right and had done so by deed of the same date as the indenture. The grant itself was to be in perpetuam.

Under these circumstances we think one great purpose of the parties in framing and executing the formal instruments setting forth the terms of the contract and grant agreed upon, was to make certain for all time the quantity of water to be drawn by the city for power, so that no real question could arise whether the quantity being drawn at a given time was in excess of the quantity granted. Adhering to the literal meaning of the language of the granting clause in the indenture, that purpose is practically accomplished. The amount of water to be drawn is constant. Whether the city is at any time drawing more than that amount can be easily determined with practical accuracy by measurement and calculation. There will be no question left for court or jury. On the other hand under the construction contended for by the city, that purpose is not accomplished. The quantity of water necessary to be drawn from the dam to produce 600 horse power on the shaft can never be constant. It will vary, and sometimes widely, with changes in the character and condition of the conduits, flumes, gates and wheels and with changes in the degree of the skill and care of operation, all of which were to be, and are, under the exclusive control of the city. It is common knowledge that there is often a difference in the efficiency of water power plants under the same head according to the plan and workmanship of their construction, and the ability of management. There is also an appreciable difference in the efficiency of different makes of the water wheels under the same conditions. It also appears from the evidence that the same wheel under the same head will produce more or less power according to the skill and watchfulness of its operator. Further, it is a familiar fact in hydraulics that the efficiency of water wheels diminishes with use from a roughening of the interior surfaces.

It is evident, therefore, that under the city's contention doubtful and troublesome questions may repeatedly arise as to whether the city's water wheels and plant were of the character and in the condi-

tion they should have been, and were being operated with the care, skill and watchfulness they should have been. These are questions for the jury and no one, nor several, verdicts can settle them for the future, since the conditions as to wheels, plant and management may be continually changing, and the verdict of one jury is not binding on another jury. A wide door is thus left open for repeated and indecisive litigation, whereas contracts and grants are put in writing to close the door against litigation.

The city, however, urges several arguments against the proposition that the language of the grant, in its place and with its history, signifies a fixed, definite quantity of water rather than a definite amount of mechanical force on the shaft. It invokes the rule that where the words of a grant are fairly susceptible of two different meanings, the meaning most favorable to the grantee will be presumed to be the real meaning. Even if the language of this grant was susceptible of the meaning contended for by the city, the rule is not applicable, for not only is the grant by an indenture executed by the city as well as by the company, but it is in pursuance and follows the language of the prior contract of August 1877, mutually agreed upon by the parties. The language is that of the city, as much as that of the company.

The city further urges that the large sum paid by the city, $200,000, shows that it was to have at least 600 actual horse power on its shafts;—that the interest even at 4% on $200,000 is much more than the usual rental of water power on Lewiston Falls. This might be a cogent argument for reforming the indenture if water for power was the only consideration for the $200,000, but inadequacy of consideration, if it exists, does not of itself change the meaning of words in a grant. In this case, however, the city bargained for more than water for power. It bargained for water for distribution, for a lot of land, and for expensive work to be done by the company "for the promotion of the general interests of the city." It cannot be known what part of the sum paid was for these other matters. If it be said that the city could take water for distribution without paying for it, the answer is that the city officials of 1877 evidently

VOL. CI 37

thought the company's consent should be obtained and incorporated in the writings.

Attention is also called by the counsel for the city to the description of the grant of water for power "as appurtenant to the said lot conveyed as aforesaid by said Franklin Company to said City of Lewiston." This language simply limits the right of the city to draw water to such as it shall utilize on that lot. It cannot lead the water elsewhere for power purposes.

The principal argument of the city, however, is drawn from the language of the next prior clause, that defining the quantity of water the city might take for distribution under the enabling statute. That quantity is there defined to be "so much water every twenty-four hours . . . . as six hundred (600) horse power at a head of twenty five (25) feet will pump from the Androscoggin River above the dam near the Lincoln Mill so called in Lewiston to a height of two hundred and twenty (220) feet twelve (12) hours in every twenty four (24)." The counsel argues that this language means as much water as six hundred horse power on the shaft will pump, and hence the term "six hundred horse power" must have the same meaning in the clause granting water for power. It is said that the words "will pump" imply practical horse power, net horse power, that actually exerted on the shaft. This may be conceded without affecting the argument for the construction heretofore stated. The issue, it should be remembered, is not between theoretical horse power and practical horse power. It is simply between a fixed, constant ratio of efficiency and an uncertain, varying ratio; between a fixed definite quantity of water, and a comparatively indefinite and changing quantity. The words "will pump" may as well refer to a fixed, agreed ratio of efficiency, as to an uncertain, varying ratio.

But whatever the term "six hundred horse power" taken by itself in this prior clause may seem to mean, it does not follow that it must have the same meaning in the next subsequent clause. The subject matter of the former clause was of trifling account compared with that of the latter. The quantity of water to be taken for distribution was scarcely five per cent of the quantity to be drawn for power. The latter quantity was the great consideration of the

contract. The most care would naturally be taken to fix that quantity. It was important for that to be fixed and definite, as that was the valuable right affecting many prior grantees as well as the Franklin Company, and concerning which litigation was most likely to arise. The former quantity was almost negligible in comparison. If either clause controls the other, the more important controls the less important.

In this connection the city also cites the habendum clause in the indenture. The language is, "To have and to hold said water and water power and the right, privilege and easement to draw and use the same as above described." The argument is that this language means a grant of water power in contra-distinction from a grant of water for power. The answer is that while the habendum may sometimes enlarge the estate in the thing granted, it can never enlarge or extend the thing itself, the subject matter of the grant. *Manning* v. *Smith*, 6 Conn. 289. It is also a familiar rule that anything in the habendum repugnant to the terms of the granting clause, must give way.

We have carefully considered the whole evidence and every argument advanced by either counsel, but we think there is no need to extend the already great length of this opinion in order to state more of them than we have. We believe we have stated enough to show the grounds of our decision. Our conclusion from them all, is that the language of the clause in the indenture of Nov. 5, 1877, granting the right to draw water for power purposes, defines the quantity of water and not the amount of power or mechanical force, and fixes that quantity of water to be that which will produce 600 practical horse power reckoning the practical efficiency to be 75 per cent of the theoretical, or in other words 800 theoretical horse power. Arriving at this conclusion, we find in it no hardship upon the city. It appears from the evidence and books on the subject, that with the best modern water wheels and a well planned and thoroughly built plant, carefully adjusted and operated by capable and careful workmen, it is feasible and not difficult for the city to obtain an efficiency of 75 per cent and even more, and thus obtain in the future a full

six hundred horse power on its wheel shafts without extra payment even under this decision.

That the city has drawn water for power in excess of the amount granted under the above construction of the grant is not questioned. The amount of such excess is not in dispute as the engineers employed by each party to measure the water practically agree as to . the amount of water drawn. The preponderance of the evidence is that water for power from the plaintiff's dam at Lewiston was fairly worth $12.50 per horse power. Upon this basis the computations of the engineers show the value of the excess water diverted for the six years prior to the date of the writ to be $3468.55. The plaintiff urges that interest on the value of each year's excess should be added. In actions of tort, however, as this is, interest is not recoverable as of right but only in the discretion of the court or jury. *Lincoln* v. *Claflin*, 7 Wall. 132. *Moulton* v. *Scruton*, 39 Maine, 287. In this case we think it enough to add interest from the date of the writ. The city seems to have acted in good faith.

*Judgment for the plaintiff for $3468.55 and interest from the date of the writ.*