DIVISION 1235, AMALGAMATED TRANSIT UNION, AFL–CIO, Plaintiff,

v.

METROPOLITAN TRANSIT AUTHORITY, ATE Management and Service Co., and Transportation Management of Tennessee, Inc., Defendants.

No. 79–3275.

United States District Court,
M. D. Tennessee,
Nashville Division.

Aug. 31, 1979.

Cecil D. Branstetter, Nashville, Tenn., for plaintiff.

Peter H. Curry, Ellen Bronaugh, Nashville, Tenn., for defendants.

## MEMORANDUM

WISEMAN, District Judge.

Plaintiff, Division 1235, Amalgamated Transit Union (hereinafter referred to as "Union") filed its cause of action in this Court against the defendants, Metropolitan Transit Authority (hereinafter referred to as "MTA"); ATE Management and Service Company (ATE), and Transportation Management of Tennessee (TMT). In its complaint the Union sought to compel the defendants to proceed to binding arbitration of the disputed terms of a new collective bargaining agreement which the parties have failed to negotiate. The Union asked this Court to grant a declaratory judgment and a preliminary injunction in addition to damages and attorney fees. Pursuant to Fed.R.Civ.P. 65, the Court ordered the trial of the action on the merits to be advanced and consolidated with the hearing on the application for the preliminary injunction. Oral argument was heard on the facts stipulated by the parties on June 18, 1979. The defendants insists that the Union is not entitled to the relief it seeks for reasons examined below.

## STATEMENT OF FACTS:

From 1956 until 1973 the intracity transit system in Nashville, Tennessee, was operated by the Nashville Transit Company, a privately owned enterprise regulated by the Nashville Transit Authority. In 1973 the Metropolitan Government applied to the United States for a Mass Transportation Capital Improvement Grant under the Urban Mass Transportation Act of 1964 (hereinafter referred to as UMTA), 49 U.S.C. § 1601 *et seq.* This federal grant enabled the city to purchase the assets of Nashville Transit Company and buy capital equipment for urban mass transportation. At the time of this purchase, the MTA entered into an "Advisory and Management Agreement" with ATE whereby that company agreed to provide management services, including labor relations and labor contract negotiation, for the MTA. ATE formed the corporation, TMT, to be the employer of all employees necessary for the operation of the transit system.

Also in 1973, the Metropolitan Government entered into an agreement with the Union in compliance with the mandates of section 13(c) of the UMTA, 49 U.S.C. § 1609(c).[1] That section provides that as a condition to a federal grant or loan the

---

1. 49 U.S.C. § 1609(c) provides as follows:

 It shall be a condition of any assistance under section 1602 of this title that fair and equitable arrangements are made, as determined by the Secretary of Labor, to protect the interests of employees affected by such assistance. Such protective arrangements shall include, without being limited to, such provisions as may be necessary for (1) the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) under existing collective bargaining agreements or otherwise; (2) the continuation of collective bargaining rights; (3) the protection of individual employees against a worsening of their positions with respect to their employment; (4) assurances of employment to employees of acquired mass transportation systems and priority of reemployment of employees terminated or laid off; and (5) paid training or retraining programs. Such arrangements shall include provisions protecting individual employees against a worsening of their positions with respect to their employment which shall in no event provide benefits less than those established pursuant to section 5(2) of this title. The contract for the granting of any such assistance shall specify the terms and conditions of the protective arrangements.

public agency applying for the funding must provide for protective arrangements on behalf of transit employees affected by such assistance. These arrangements must be approved by the Secretary of Labor and incorporated into the grant contract between the public agency and the United States. Critical to the determination of this suit is paragraph 8 of the parties' 1973 section 13(c) agreement which provides, in pertinent part, that:

> In case of any labor dispute or controversy regarding the application, interpretation, or enforcement of any of the provisions of this agreement which cannot be settled by collective bargaining within sixty (60) days after the dispute or controversy first arises hereto, such dispute or controversy may be submitted at the written request of the Metropolitan Government (or the operator of the transit system as its designate) or the Union to a board of arbitration as hereinafter provided. Each party shall, within ten (10) days after such request, select one member of the arbitration board, and the members thus chosen shall select a neutral member who shall serve as chairman. Should the members selected by the parties be unable to agree upon the appointment of the neutral member within ten (10) days, any party may request the American Arbitration Association to furnish a list of five (5) persons from which the neutral member shall be selected. The parties shall, within five (5) days after receipt of such list determine by lot the order of elimination, and thereafter the Union and the other interested party or parties shall, in that order, alternately eliminate one name until only one name remains. The remaining person on the list shall be the neutral member. The decision by majority vote of the arbitration board shall be final, binding and conclusive. Each party shall pay the fees and expenses of the arbitrator it selects.

The fees and expenses of the third or impartial arbitrator, as well as any other joint expenses incidental to the arbitration, shall be borne equally by the parties. The term "labor dispute", for the purposes of this paragraph, shall be broadly construed and shall include, but not be limited to, any controversy concerning wages, salaries, hours, working conditions, or benefits, including health and welfare, sick leave, insurance, or pension or retirement provisions, any differences or questions that may arise between the parties, including the making or maintaining of collective bargaining agreements, the terms to be included in such agreements, any grievances that may arise, and any controversy arising out of or by virtue of any of the provisions of this agreement for the protection of employees affected by the Project.

In 1975 MTA applied to and received from the federal government a second grant under the UMTA. In connection with this grant, the Union and the MTA concluded a new section 13(c) agreement, paragraph 9 of which parallels paragraph 8 of the 1973 agreement.

■ Additionally, the parties have entered into a collective bargaining agreement which was to continue in effect from June 1, 1976, until May 5, 1979. This contract was renewable automatically from year to year thereafter unless one of the parties notified the other within sixty days prior to any expiration date of a desired change or changes in their agreement. According to practice which had been followed throughout the years, the Union gave written notice to the Federal Mediation and Conciliation Service of its intent to negotiate a new collective bargaining agreement thirty days prior to the expiration of the last agreement.[2] Subsequently, the Union and the MTA reached an impasse in regard to wage negotiation and were unable to agree as to what was the appropriate dis-

---

2. According to the parties' stipulation of facts, thirty days notice was given to the Federal Mediation and Conciliation Service whereas the parties' collective bargaining agreement requires that sixty days notice be given to either party in regard to the negotiation of a new collective bargaining agreement. The defendants do not raise the issue of untimely notice, however.

pute settlement procedure to follow. The Union demanded binding interest arbitration pursuant to the parties' 1973 and 1975 section 13(c) agreements.[3] The MTA refused to arbitrate insisting instead that it would cooperate with the Federal Mediation Conciliation Service in an effort to reach an agreement with the Union on a new contract. It was this controversy that precipitated the present litigation.

### DEFENDANTS' CONTENTION THAT THIS COURT IS WITHOUT SUBJECT MATTER JURISDICTION OF THE INSTANT CONTROVERSY.

The Union relies upon the existence of federal question jurisdiction pursuant to 28 U.S.C. § 1331, the UMTA, 49 U.S.C. § 1601, *et seq.* and the doctrine of pendent jurisdiction. In support of this position, the Union cites three cases decided by the United States Courts of Appeals which found federal jurisdiction over actions concerning section 13(c) agreements. *Local Division 714, Amalgamated Transit Union v. Greater Portland Transit Dist.,* 589 F.2d 1 (1st Cir. 1978); *Amalgamated Transit Union v. LaCrosse Municipal Transit Util.,* 585 F.2d 1340 (7th Cir. 1978); *Division 1287, Amalgamated Transit Union v. Kansas City Area Transp.,* 582 F.2d 444 (8th Cir. 1978), *cert. denied,* 439 U.S. 1090, 99 S.Ct. 872, 59 L.Ed.2d 56 (1979). In all three of these decisions the unions filed suit to compel the public authorities to proceed with binding interest arbitration in order to determine the provisions of a new collective bargaining agreement to replace the one which had expired.

In *Kansas City,* the union's claim that federal jurisdiction inhered in the district court by virtue of 28 U.S.C. § 1331(a) was premised on the contention that the suit arose under the UMTA and that the amount in controversy was in excess of $10,000.[4] The court concluded that the union had satisfied the jurisdictional monetary requirement before addressing the more difficult issue of whether the case was one that "arises under" the laws of the United States or was merely a suit on a contract not involving a federal question as the public authority contended. In resolving this issue, the court cited the test enunciated by Justice Cardozo in *Gully v. First Nat'l Bank,* 299 U.S. 109, 57 S.Ct. 96, 81 L.Ed. 70 (1936), also cited by the defendants in the present case, as the test most frequently used in determining federal question jurisdiction. The *Gully* test provides:

How and when a case arises 'under the Constitution or laws of the United States' has been much considered in the books. Some tests are well established. To bring a case within the statute, a right or immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action. . . . The right or immunity must be such that it will be supported if the Constitution or laws of the United States are given one construction or effect, and defeated if they receive another. . . . A genuine and present controversy, not merely a possible or conjectural one, must exist with reference thereto . . . and the controversy must be disclosed upon the face of the complaint, unaided by the answer or by the petition for removal. . . . Indeed, the complaint itself will not avail as a basis of jurisdiction in so far as it goes beyond a statement of the plaintiff's cause of action and anticipates or replies to a probable defense. . . .

*Id.* at 112–113, 57 S.Ct. at 97–98, 81 L.Ed. at 72 (citations omitted).

In light of the above principles, the purpose of the UMTA, and section 13(c)'s requirements that protective arrangements be

---

**3.** Interest arbitration is the type of arbitration that may be mandated when an employer and the collective bargaining agent of employees come to an impasse with regard to the terms and conditions of a new collective bargaining agreement. It is distinguished from grievance arbitration which may be mandated when dis-

putes arise under an existing collective bargaining agreement.

**4.** The parties in the present case have stipulated that the amount in controversy is well over $10,000.

made in order to protect the economic interests of transit employees, the court held that the union's claim involving a breach of a section 13(c) agreement was a controversy that arises under the laws of the United States.

The court in *LaCrosse, supra,* also relied upon the guideposts established in *Gully* thereby focusing its inquiry on whether the source of an essential element of the union's cause of action for breach of contract originated in a federal law. As did the court in *Kansas City,* the *LaCrosse* court noted that the UMTA requires the making of a section 13(c) agreement containing fair and equitable arrangements approved by the Secretary of Labor. Moreover, the court recognized that this requirement is a continuing one directing the parties to abide by such an agreement. Because of the interrelation between a section 13(c) agreement and the federal statutory plan, the court found that section 1331 subject matter jurisdiction must necessarily arise.

In dealing with the jurisdictional question in *Greater Portland, supra,* the court quoted the *Gully* test and reviewed the principles of *Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946). In *Bell,* the Supreme Court concluded that a federal court must entertain a complaint seeking recovery directly under the Constitution or laws of the United States subject to the exceptions that the alleged claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly unsubstantial and frivolous." *Id.* at 682–83, 66 S.Ct. at 776, 90 L.Ed. at 943. Prior to applying the principles of *Gully* and *Bell,* however, the court subjected the union's theory of recovery to three interpretations. The broadest interpretation applied to the union's complaint would construe section 13(c) as commanding interest arbitration, a mandate which the defendant had violated. The *Greater Portland* court discredited this interpretation as does this Court, since section 13(c) itself makes no provision for interest arbitration although such a provision could arguably effectuate the labor protections guaranteed in that statute.

The narrowest construction is advanced by the defendant in this case on the basis of Judge Wellford's decision in *Local 1285, Amalgamated Transit Union v. Jackson Transit Auth.,* 447 F.Supp. 88 (W.D.Tenn. 1977), which predated the three United States Appeals Court section 13(c) opinions and is now on appeal before the Sixth Circuit. The union in *Jackson,* in addition to claiming that the city had violated the UMTA and the section 13(c) agreement executed pursuant thereto, argued that the United States Secretaries of Transportation and Labor had failed to secure compliance with the mandates of section 13(c). The court held that the UMTA did not create a federal right or remedy in favor of the union to demand such enforcement action. Furthermore, the court rejected the union's argument that the court had jurisdiction under 28 U.S.C. §§ 1331 and 1337 on the ground that a breach of a section 13(c) agreement must be treated as a breach of section 13(c) itself. The court asserted that Congress did not intend for federal courts to become involved in local labor disputes or for federal law to preempt state remedies stemming from what the opinion characterized as a state-law breach of contract or arbitration claim.

■ Having repudiated the two extreme interpretations discussed above, the court in *Greater Portland* endorsed a middle ground interpretation propounded by the union in support of recovery and concluded that there was federal jurisdiction. This interpretation was based on the reasoning that Congress implicitly mandated compliance with the labor protective provisions pursuant to the command of section 13(c). Thus a breach of the contract containing such provisions was deemed to contravene that statute. The *Greater Portland* court reinforced its conclusion by holding that the union's claim satisfied the *Gully* and *Bell* criteria since the complaint sought recovery directly under the laws of the United States and was not "wholly insubstantial and frivolous."

This Court believes that the middle ground construction of the Union's complaint as discussed in the *Greater Portland* case is the better reasoned approach. Thus, because a section 13(c) agreement is infused with statutory prerequisites, this Court finds that it has federal question jurisdiction.

*DEFENDANTS' CONTENTION THAT THE UNION HAS FAILED TO STATE A CLAIM ON WHICH RELIEF MAY BE GRANTED.*

 As the court stated in *Kansas City*, the question of whether a particular case is one that "arises under" the Constitution or laws of the United States is entirely separate and distinct from the question of whether the plaintiff's complaint states a meritorious claim upon which relief can be granted. The defendants contend that the section 13(c) cases that have been litigated in favor of the union at the appellate level and relied upon by the Union here are not applicable to the present controversy. The applicability of the *Greater Portland* case is discounted by the defendants on the ground that in that decision the court dealt *only* with the issue of whether the federal court had jurisdiction. This Court finds, however, that the defendants' conclusory assertion regarding the *Greater Portland* decision is incorrect in light of the court's statement that, "Notwithstanding federal jurisdiction over the subject matter of the Union's § 13(c) claim, the summary dismissal by the district court must be affirmed if the Union has failed to state a claim upon which relief can be granted." *Id.* at 11. In determining whether the union's claim was remedial the court employed a two-part inquiry under which the court must decide whether a breach of a section 13(c) agreement is implicitly, if not expressly, a violation of section 13(c) itself. If so, the court must decide whether the union has a private federal remedy for a statutory violation of that nature. In respect to the first inquiry, the *Greater Portland* court determined that the statutory arrangements mandated in section 13(c) affording certain protections to transit employees would be utterly meaningless if unobserved and con-

cluded that section 13(c) implicitly, although not expressly, commands compliance by the grant recipient with the terms and conditions of an approved protective arrangement upon which the grant was conditioned. This determination was made irrespective of whether or not other terms and conditions would equally have been acceptable under that statute. Furthermore, the court concluded that a private federal remedy to the union for breach of a section 13(c) agreement is implied. This conclusion was premised on the reasoning that since the federal financial assistance contract between the Secretary of Transportation and the grantee is enforceable in federal court in suits brought by the Secretary, Congress also must have contemplated that protected transportation employees would be able to institute private enforcement actions. The court buttressed its conclusion that a private federal remedy on the union's behalf is implied in section 13(c) by ruling that the case satisfied the four factors cited by the Supreme Court as essential to the implication of a private remedy from a federal statute in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). Thus, while the *Greater Portland* court did not rule on the propriety of an injunction, the court did find that the union had stated a claim upon which a federal court could grant relief.

The *LaCrosse* court also found that section 13(c) agreements were enforceable contracts at the instance of the parties thereto and stated that the statutory scheme outlined in UMTA and the policy underlying section 13(c) of that Act implies a federal remedy. However, the defendants discredit the application of this case to the present controversy contending that it is factually dissimilar. This contention is based on the argument that the transit employees in *La-Crosse* experienced a "worsening of their position" when the city acquired the transit system previously operated by a private enterprise. The acquisition caused the status of the employees to change from private to public employees resulting in the surrender of the workers' right to strike and their exclusion from coverage under the National

Labor Relations Act. The defendants contend that the employees in the present case retain the right to strike and there has been no worsening of their situation.

The defendants maintain that the *Kansas City* case is also inapplicable to the instant controversy because of its factual disparity. In *Kansas City* the collective bargaining agreements between the union and the private transit company provided for binding interest arbitration as to the terms on which the parties could not agree. Subsequent disputes between the union and the public agency which took over the urban transit system were resolved by interest arbitration as well. In 1977 the public agency refused to submit to interest arbitration giving rise to litigation. The court clarified the fact that the suit was based on the section 13(c) agreement and that the rights of the parties must be measured by that agreement which was not identical in terms to the collective bargaining contract. The court then cited paragraph 17 as the controlling provision of the section 13(c) agreement which is comparable to paragraph 8 of the 1973 section 13(c) agreement and paragraph 9 of the 1975 section 13(c) agreement between the defendants and the United States in the present case. In light of the language of paragraph 17, the *Kansas City* court found that the section 13(c) contract required interest arbitration.

The defendants place much emphasis on the fact that in *Kansas City* the parties had a history of binding interest arbitration, unlike the parties in the present suit, and, therefore, the section 13(c) agreement in that case merely preserved this right upon the agency's take over of the urban transit operations. In the present case the defendants argue that there is no history of binding interest arbitration to be preserved in a section 13(c) agreement.

This Court believes, however, that the section 13(c) agreements in *Kansas City*, *LaCrosse* and the present case are similar since each of the three agreements provide for interest arbitration of labor disputes.

The critical, and this Court deems the decisive, language in the 1973 section 13(c) agreement in the instant suit which was carried over and incorporated in paragraph 9 of the 1975 agreement is the definition of "labor dispute." Both agreements state that this term "shall be broadly construed and shall include, but not be limited to, any controversy concerning . . . the making or maintaining of collective bargaining agreements, the terms to be included in such agreements, any grievances that may arise, and any controversy arising out of or by virtue of any of the provisions of this agreement for the protection of employees affected by the Project." [5] Similar definitions of the term "labor dispute" are found in *Kansas City* and *LaCrosse*.

The defendants have attempted to exempt the present controversy between the parties from this declared definition on the basis of paragraph 16 of the 1975 section 13(c) agreement which states:

> It is understood and agreed between the parties that this agreement is to be construed and interpreted only as an agreement to protect the rights, privileges and benefits, including pension rights and benefits of employees which may be *affected by the project and is not to be construed as an agreement related to other circumstances which affect employees* (emphasis added).

In light of this language the defendants contend that the provisions providing for interest arbitration in the section 13(c) agreements do not come into play since the controversy involved in the present litigation does not relate specifically to the UMTA grant or project.

As previously stated, however, in both the 1973 and the 1975 section 13(c) agreements, paragraphs 8 and 9, respectively, clearly provide a very specific procedure for binding arbitration of labor disputes encompassing the *making or maintaining of* collective bargaining agreements, the very definition of interest arbitration. These paragraphs expressly give transit employ-

---

**5.** The 1975 section 13(c) agreement between the defendants and the United States omits the words "for the protection of employees affected by the Project."

ees a new right which these workers did not have in prior or existing collective bargaining agreements with the defendants or the defendants' predecessors. This right was subsequently taken away by paragraph 16 in the 1975 section 13(c) agreement. Thus, this Court is confronted with two conflicting provisions and must look to basic canons of contractual interpretation and construction. *Kenneth Reed Construction Corp. v. United States*, 475 F.2d 583, 587, 201 Ct.Cl. 282 (1973), states that "where general and specific provisions are in any respect inconsistent, the provision that is specific controls over the provision which is general." *Hol-Gar Mfg. Corp. v. United States*, 169 Ct.Cl. 384, 351 F.2d 972 (1965); *Smoot v. United States*, 237 U.S. 38, 35 S.Ct. 540, 59 L.Ed. 829 (1915).[6] Construing the 1975 section 13(c) agreement in the present case according to this principle, this Court concludes that paragraph 9 is the more specific provision and, therefore, should control.

■ Thus, based on the determination that binding interest arbitration is mandated in the section 13(c) agreements, this Court looks to the two-part test used in *Greater Portland* and concludes that the Union has stated a claim upon which relief can be granted. This conclusion follows from the finding that because the defendants have violated their section 13(c) agreements, they have implicitly violated section 13(c) itself. The Court in making this conclusion is aware of the decision in *Division 580, Amalgamated Transit Union v. Central New York Regional Auth.*, 556 F.2d 659 (2d Cir. 1977), wherein the court deemed the congressional intention behind section 13(c) was merely to preserve the status quo with regard to the employer's obligation to bargain collectively and was not intended to

create or extend rights for transit employees. This Court has reviewed the legislative history of section 13(c) of the UMTA, however, and has been unable to find a congressional prohibition against the creation of new rights in favor of transit workers. Indeed, the express language of that statute states that arrangements made thereunder shall include, without being limited to, the provisions necessary to carry out certain enumerated guarantees to transit workers. Furthermore, this Court finds that the rights created and preserved in section 13(c) agreements can be enforced in federal court on behalf of the beneficiaries of such agreements.

■ Although it is not essential to the resolution of the present case, this Court holds that an interpretation of the section 13(c) agreements permitting the union to compel the defendants to submit to binding interest arbitration while reserving the right to strike is patently lacking in mutuality of obligation whereby both parties are bound to perform.[7] Moreover, such a construction of the section 13(c) agreements would serve to frustrate the purpose of arbitration which is to provide a mechanism for the expeditious settlement of industrial disputes without resort to strikes, lockouts, or other forms of self help. This determination is in disagreement with the reasoning of *Amalgamated Transit Union v. San Diego Transit Corp.*, No. 78–1093–E (D.Cal. Jan. 10, 1979). There the court asserted that the transit corporation's receipt of federal funding under the UMTA was its *quid pro quo* for abiding by the section 13(c) agreement including its interest arbitration provision and, presumably, a provision allowing the union to strike as an alternative

---

6. Professor Williston recognized that the majority rule is that "when one intention appears in one clause in an instrument, and a different, conflicting intention appears in another clause in the same instrument, that intention should be given effect which appears in the principal or more important clause." 4 S. Williston, *A Treatise on the Law of Contracts* § 624, at 822 (3d ed. 1961), quoting from *Union Water Power Co. v. Lewiston*, 101 Me. 564, 65 A. 67 (1906).

7. The following provision in both paragraphs 8 and 9 of the 1973 and the 1975 section 13(c) agreements, respectively, would apparently allow the union the right to strike: "Nothing in this agreement shall be construed to enlarge or limit the right of any party to utilize, upon the expiration of any collective bargaining agreement or otherwise, any economic measures that are not inconsistent or in conflict with applicable laws or any Acts relative to the Metropolitan Government."

measure. Instead this Court finds support for the assertion that a contractual arrangement for binding interest arbitration excludes the right to strike over arbitrable disputes in *Boys Markets v. Retail Clerks Union*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). In that case the Supreme Court upheld a district court's injunction against a strike by a union in violation of a no-strike clause within a collective bargaining agreement providing for binding arbitration. In so holding the Court stated that, "Clearly employers will be wary of assuming obligations to arbitrate specifically enforceable against them when no similarly efficacious remedy is available to enforce the concomitant undertaking of the union to refrain from striking." *Id.* at 398 U.S. 252, 90 S.Ct. at 1593, 26 L.Ed.2d at 211. Following the reasoning of the Court in *Boys Markets*, the court in *Avco Corp. v. Local 787, United Auto., Aerospace & Agricultural Implement Workers*, 459 F.2d 968 (3d Cir. 1972), stated, "To allow the Union to abandon its remedy of arbitration in order to disregard the 'no-strike' clause would render the collective bargaining agreement illusory and would subvert the policy favoring the peaceful settlement of labor disputes by arbitration." *Id.* at 972.

Even though the section 13(c) agreements in the present case do not contain no-strike provisions, as did the contracts in *Boys Market* and *Avco*, this Court finds that the provision for binding interest arbi-

tration in the section 13(c) agreements excludes any interpretation of the agreements which would reserve the union's right to strike. Having determined that the section 13(c) contracts between the parties mandate binding interest arbitration at the request of either the defendants or the Union, this Court orders the defendants to proceed to engage in interest arbitration.[8]

---

**8.** It is arguable that the language used in paragraphs 8 and 9 of the 1973 and 1975 section 13(c) agreements, respectively, providing that labor disputes "may" be submitted to arbitration is merely permissive and, therefore, does not mandate binding interest arbitration upon the request of one of the parties. The court in *Amalgamated Transit Union v. San Diego Transit Corp.*, No. 78–1093–E (D.Cal. Jan. 10, 1979), concluded, however, that the above contractual language requires arbitration based on *United Steelworkers of America v. American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960). In that case the Supreme Court held that disputes which "may" be submitted to the Board of Arbitration for decision required arbitration of the dispute. This Court need not resolve this question because parties herein have not addressed it.

Another issue which was not raised by the parties in the present case but was addressed by the district court in *Kansas City* is whether an agreement to arbitrate the terms of a future collective bargaining agreement will be enforced by the courts. This issue was settled by this Court in *Nashville Newspaper P.P.U., Local 50 v. Newspaper Printing Corp.*, 399 F.Supp. 593 (M.D.Tenn.1974). The collective bargaining agreement between the union and the employer in that case provided for the renewal of the parties' contract by arbitration if necessary. This Court in ordering arbitration of future contractual terms held that the doctrine favoring arbitrability applied to interest arbitration.