474 F.2d 1172
 82 L.R.R.M. (BNA) 2945, 70 Lab.Cas. P 13,480
 INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, UAW and
its Local 647, UAW, Plaintiffs-Appellants,
v.
GENERAL ELECTRIC COMPANY, INC., Defendant-Appellee.
 Nos. 72-1619, 72-1620.
 United States Court of Appeals,
Sixth Circuit.
 Argued Dec. 12, 1972.
Decided March 6, 1973.
 
 John A. Fillion, Detroit, Mich., for appellants-cross-appellees; Stephen I. Schlossberg, Detroit, Mich., Bernard C. Fox, Beckman, Lavercombe, Fox & Weil, Cincinnati, Ohio, on the brief.
 J. Mack Swigert, Cincinnati, Ohio, for appellee-cross-appellant; Robert W. Maxwell II, Cincinnati, Ohio, on the brief; Taft, Stettinius & Hollister, L. S. Stek, Cincinnati, Ohio, of counsel.
 Before EDWARDS, CELEBREZZE and PECK, Circuit Judges.
 EDWARDS, Circuit Judge.
 
 
 1
 This case involves 3,600 grievances, a major labor dispute, the memorandum agreement by which that labor dispute was settled, and the laws of this country pertaining to arbitration. Nonetheless, the efforts of the parties themselves and those of the District Judge who heard this case at the trial level have resulted in an appellate record of manageable proportions.
 
 
 2
 As the International Union, United Automobile Aerospace and Agricultural Implement Workers of America and the General Electric Company, Inc., approached the termination date of their 1963-66 labor-management agreement for the General Electric plant at Evendale, Ohio, one of the major issues concerned how to dispose of a huge backlog of grievances which had not been resolved under two prior contracts, the then existing contract and its predecessor for the years 1960-63. Under the pressure of a possible strike, and with the mediation assistance of the United States Department of Labor's mediation service, the parties met in Washington, D. C., and ultimately on December 4, 1966, signed a memorandum agreement which in certain respects amended and in other major respects extended the 1963-66 agreement. Paragraph 4 of that memorandum agreement dealt specifically with the problem of the backlog of grievances:
 
 
 3
 4. With respect to the grievance backlog, the parties agree that active grievances at 2nd, 3rd, and 4th Steps on December 4, 1966, will be combined for the purpose of expediting processing.
 
 
 4
 The International Representative of the Union will review all unresolved grievances which were active at the 2nd, 3rd, and 4th Steps of the grievance procedure on October 17, 1966, for the purpose of eliminating and disposing from any further consideration, a substantial number of such grievances. The remaining active grievances will thereupon be referred to Step 3 of the grievance procedure set forth in Article XXII of the 1966-1969 Agreement for expedited consideration.
 
 
 5
 Should any of the grievances remain unsettled after such expedited consideration at Step 3, they will then be referred to a special committee for further efforts toward resolution. The Committee will be composed of the Manager of Union Relations, a Staff Representative, and a specialist from the Union's International Headquarters. Such grievances as may remain unsettled after consideration by the Committee will be categorized by the Committee into one of the following categories:
 
 
 6
 A. Grievances which are (1) arbitrable as a matter of right under the terms of the 1963-1966 collective bargaining agreement and as to which either party will determine whether it desires to proceed to arbitration and (2) arbitrable under the 1963-1966 agreement by mutual agreement.
 
 
 7
 B. Grievances which would constitute a contract violation but which are deemed to be non-arbitrable by the Company under the terms of the 1963-1966 Agreement. The Union will determine whether or not they wish to strike or proceed in court on such grievances under the terms of Section 301 of the Taft Hartley Act.
 
 
 8
 C. Non-contractual grievances. Should any of such grievances be issues upon which the Union elects to strike, it shall give ten days notice thereof to the Federal Mediation and Conciliation Service. The Company should be simultaneously notified. The grievance backlog program shall be conducted during the period January 3, 1967 through April 3, 1967, at the end of which period the Special Grievance Committee will be dissolved, and all matters connected with the issue of backlog of grievances shall be deemed settled for all purposes, excepting only such arbitration proceedings initiated or court actions which may have been filed, or any non-contractual grievances in mediation, or where notice of intent to strike has been given.
 
 
 9
 Between December 4, 1966, and April 3, 1967, the parties met and sought to resolve as many of the grievances as possible. It is clear from this record that during this period the total backlog of grievances from 1960 down to December 4, 1966, were under negotiation and that a number of grievances from the 1960-63 period were resolved along with numbers of grievances from the 1963-66 period.
 
 
 10
 Nonetheless, as of April 3, 1967, a formidable number of grievances still remained as to which there was no agreed-on solution and as to which the union claimed the absolute right to arbitration under the contract and the company asserted that, under the same contract, no such right existed. Thereupon the union filed suit in the United States District Court for the Eastern District of Michigan under Sec. 301 of the Labor-Management Relations Act, 29 U.S.C. Sec. 185(a) (1970) for a decree compelling arbitration. The case was transferred to the United States District Court for the Southern District of Ohio and there was heard by a District Judge in the Western Division.
 
 
 11
 The parties then filed a stipulation classifying the grievances into six classes (plus two individual grievances grouped generally with the B2 class) and agreeing upon a typical grievance as illustrative of the class concerned. The chart below is an attempt to present the stipulation in skeleton form:
 
 
 12
 Exhibit Brief description of grievance Contract period
 No. during which
 grievance arose
--------- ------------------------------------------------ ------------------
A1 Working in higher class 1963-66
A2 Working in higher class 1960-63
B1 Supervision or salaried personnel working on 1963-66
 bargaining unit.
 Company says not bargaining unit work.
B2 Supervision or salaried personnel working on 1960-63
 bargaining unit.
 Company says not bargaining unit work. (Also
 2AFN and 88E2 (past Step 4))
C1 Supervision working in bargaining unit. 1963-66
 Company admits bargaining unit work, but claims
 is justified under contract.
C2 Supervision working in bargaining unit. 1960-63
 Company admits bargaining unit work, but claims
 is justified under contract.
 
 
 13
 The complaint in this case was filed April 3, 1967. The parties then filed exhibits and the stipulation referred to, along with cross-motions for summary judgment. The District Judge after argument of those motions entered an extensive memorandum on November 7, 1969, deciding all issues presented, except whether or not the 1960-63 grievances covered by the B2 and C2 classifications were arbitrable. On this issue he conducted an evidentiary hearing on May 17, 1971, and subsequently decided same by Memorandum Decision of January 24, 1972. A final judgment was entered April 20, 1972.
 
 The District Judge held that:
 
 14
 (1) Defendant was entitled to judgment as a matter of law with respect to grievances in the A1 and A2 classifications.
 
 
 15
 (2) Plaintiffs were entitled to judgment with respect to grievances listed in the B1 and C1 classifications.
 
 
 16
 (3) Defendant was entitled to judgment as a matter of law as to the grievances listed in the B2 and C2 classifications.
 
 
 17
 He held that defendant was also entitled to judgment as a matter of law as to grievances 2AFN and 88-E2 listed in the B2 classification separately.
 
 
 18
 Some of the complications in this appeal can quickly be eliminated. For reasons of its own, the company has not appealed the District Judge's order that the C1 grievances be arbitrated. Additionally, our inspection of the Memorandum Agreement of December 4, 1966, indicates that it contains no language which shows an intention of the parties to include in the "grievance backlog" the two individual grievances from the 1960-63 period which had already gone beyond step four. The backlog which the Memorandum of Settlement decided to deal with is clearly defined as "active grievances at 2nd, 3rd and 4th steps on December 4, 1966." Hence, we affirm the District Judge on this issue.
 
 
 19
 This then leaves us with three issues on this appeal, each of them pertaining to a class of grievances, of course. (1) The union appeals the District Judge's decision, holding that A1 and A2 grievances are not arbitrable because of his holding that there is no contract language prohibiting management from working an employee out of classification. (2) The company appeals from the District Judge's decision holding that B1 grievances pertaining to supervisors doing work in the bargaining unit were arbitrable grievances because of ambiguity existing as the result of conflict between two terms of the 1963-66 agreement. (3) Finally, the union appeals the District Judge's holding that under the Memorandum of Settlement of December 4, 1966, all 1960-63 grievances (A2, B2 and C2) were excluded from arbitration because of the Memorandum of Settlement's employment of the language "under the terms of the 1963-66 agreement." We affirm the District Judge on the first and second issues and reverse on the third.
 
 
 20
 We believe the District Judge handled and decided the first and second issues with full recognition of the strong federal preference for arbitration set forth in the Steelworkers trilogy: United Steelworkers v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). Illustrative of that preference is this language from the Warrier & Gulf case:
 
 
 21
 The Congress, however, has by Sec. 301 of the Labor Management Relations Act, assigned the courts the duty of determining whether the reluctant party has breached his promise to arbitrate. For arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit. Yet, to be consistent with congressional policy in favor of settlement of disputes by the parties through the machinery of arbitration, the judicial inquiry under Sec. 301 must be strictly confined to the question whether the reluctant party did agree to arbitrate the grievance or did agree to give the arbitrator power to make the award he made. An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage. United Steelworkers v. Warrior & Gulf Navigation Co., supra at 582-583, 80 S.Ct. at 1353. (Footnote omitted.)
 
 THE A1-A2 GRIEVANCES
 
 22
 The disposition of the union's appeal from the District Judge's denial of an arbitration order concerning the A1 grievance classification requires some additional facts concerning the arbitration clauses in the 1963-66 labor-management contract between these parties. While the contract contains a fairly elaborate arbitration clause, it clearly does not provide for compulsory arbitration of all grievances or for that matter for an absolute no strike clause. Management's right to reject arbitration (with specific named exceptions) is reserved in Article XXIII, paragraph 2, and the union's right to strike in the event of the company's refusal to arbitrate is reserved in article XXIV, paragraph 2.
 
 
 23
 Further, the 1963-66 contract does not contain the broad arbitration clause of the preceding 1960-63 contract. For reasons best known to the parties, Article XXIII dealing with arbitration in the 1963-66 contract was substantially changed to read as follows:
 
 ARTICLE XXIII ARBITRATION
 
 24
 1. Any grievance which involves the interpretation or application of this Agreement and which remains unsettled after having been fully processed pursuant to the provisions of Article XXII shall, notwithstanding the Company's right to refuse to arbitrate grievances, as reserved in Article XXIV, para. (2), be submitted to arbitration upon written request of either the Union or the Company, provided such request is made within 30 days after the final decision of the Company has been given to the Union pursuant to Article XXII, and provided such requests directly raises an issue which is either
 
 
 25
 (a) a disciplinary penalty, consisting of a warning notice, a suspension, or a discharge, which penalty is imposed on or after the effective date of this Agreement, and is alleged to have been imposed without just cause, but not a disciplinary penalty effected under Company Policy 20.4;
 
 
 26
 or
 
 
 27
 (b) an alleged violation of one of the following provisions of this Agreement:
 
 
 28
 There follow 17 specifically enumerated articles with specific exceptions excluding arbitration in eight of them.
 
 
 29
 It thus appears that the arbitration clause in the 1963-66 contract was written with great particularity as to what was and what was not subject to arbitration. As the District Judge noted, the strong preference in the federal law favoring arbitration does not allow the courts to order arbitration of an issue which the parties have not agreed to arbitrate. John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1963); Atkinson v. Sinclair Refining Co., 370 U.S. 238, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1961); United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); District 50, UMW v. Chris-Craft Corp., 385 F.2d 946 (6th Cir. 1967).
 
 
 30
 The union relies upon the listing of Article VIII in the list of 17 arbitrable articles. Article VIII is, however, listed with an exclusionary clause:
 
 
 31
 Article VIII, Rates of Pay, including violation of the provisions on starting rate, transfer rate, progression, and merit increase, but excluding any issue pertaining or relating in any way to the establishment, changing or elimination of a job classification or a wage rate, or the method by which an employee is paid.
 
 
 32
 The typical grievance chose as representative of the A1 and A2 classifications follows:
 
 
 33
 NATURE OF GRIEVANCE (Contract Article Violated):
 
 Working over classification
 DESCRIBE SPECIFICALLY WHAT HAPPENED
 
 34
 (Who, When, What, Where, How, Etc.): Flo McMillen worked two days identifying sorting and segregating mixed parts in the C.E.O. warehouse. They do not have an inspector there
 
 THE UNION'S POSITION:
 
 35
 This is not an R-12 job it is an R-15 inspectors job. That she be paid R-15 pay for 16 hrs.
 
 
 36
 The exclusionary language following the listing of Article VIII as set forth above must be read as specifically excluding from arbitration the exact type of dispute over an employee working out of classification as is described in the typical grievance.
 
 
 37
 We have carefully inspected Article VIII upon which the union relies to show an ambiguity which requires arbitration. It does not contain any provision which even arguably prohibits working an employee over classification. And the union does not seek to identify any such language elsewhere in the agreement. On this issue we find no ambiguity to trigger the Warrior & Gulf rule. This issue is, we believe, governed by the settled law of John Wiley & Sons v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1963):
 
 
 38
 "Under our decisions, whether or not the company was bound to arbitrate, as well as what issues it must arbitrate, is a matter to be determined by the Court on the basis of the contract entered into by the parties." Atkinson v. Sinclair Refining Co., 370 U.S. 238, 241, 82 S.Ct. 1318, 1320, 8 L.Ed.2d 462. Accord, e. g., United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409. . . .
 
 
 39
 The duty to arbitrate being of contractual origin, a compulsory submission to arbitration cannot precede judicial determination that the collective bargaining agreement does in fact create such a duty. Thus, just as an employer has no obligation to arbitrate issues which it has not agreed to arbitrate, so a fortiori, it cannot be compelled to arbitrate if an arbitration clause does not bind it at all. Id. at 546-547, 84 S.Ct. at 913.
 
 
 40
 On this issue the judgment of the District Court is affirmed.
 
 THE B1 GRIEVANCES
 
 41
 The District Judge ordered arbitration of grievances classified under the B1 list attached to the stipulation of the parties. The grievance chosen in this stipulation as typical of those on the B1 list is described as follows:
 
 
 42
 NATURE OF GRIEVANCE (Contract Article Violated):
 
 Overtime
 DESCRIBE SPECIFICALLY WHAT HAPPENED
 
 43
 (Who, When, What, Where, How, Etc.): Two salaried employees on 1/9/66 performed bargaining unit work on Machine No. P425. Neither Machine Operator nor Union Representative, was notified; present or aware of the operation, during this mal-practice.
 
 
 44
 Each party argues a contract provision as directly applicable. Plaintiffs rely upon Article XXV, paragraph 3, which says:
 
 
 45
 3. Supervisors or salaried personnel will not perform work on any job within the Bargaining Unit except in cases of emergency, or when no qualified employee is available, or when instructing an employee.
 
 
 46
 Defendant relies upon Article XXIII, paragraph 4(iv), which provides:
 
 
 47
 In addition, and notwithstanding any contrary provision of this Article, no issue shall under any circumstances be subject to arbitration if it pertains or relates in any way to: . . .
 
 
 48
 (iv) the assignment of work to, or the performance of work by, persons outside the bargaining unit; . . . .
 
 
 49
 The District Judge found that the language of Article XXV, paragraph 3, was specific and the language of Article XXIII, paragraph 4(iv), was more general and gave precedence to the more specific provision thereby finding for plaintiffs on this issue.
 
 
 50
 We think that under the Warrior & Gulf rule quoted above, the District Judge's arbitration order was appropriate because in any event the conflict between the two clauses created a clear ambiguity. Carey v. General Electric Co., 315 F.2d 499 (2 Cir.), cert. denied, 377 U.S. 908, 84 S.Ct. 1162, 12 L.Ed.2d 179 (1963). As to this issue the judgment of the District Court is affirmed.[1]
 
 THE B2 AND C2 "HOLDOVER" GRIEVANCES
 
 51
 The typical grievance selected for the B2 and C2 classifications is the same one which applied to the B1 and C1 classifications, namely, a complaint that salaried personnel were doing bargaining unit work. Thus, all that we have said concerning the arbitrability of such grievances which arose during the 1963-66 contract applies a fortiori to those grievances which arose during the 1960-63 contract, since the language of the earlier contract was more favorable to arbitrability than that contained in the later contract.
 
 
 52
 The "holdover" grievances (ones which arose during the 1960-63 contract period) were undisposed of when that contract terminated and were still pending at steps 2, 3 or 4 of the grievance procedure on December 4, 1966. Our first question as to these grievances is: Were they still viable grievances for purposes of arbitration on that date, or had they ceased to be viable because of termination of the 1960-63 and the 1963-66 contracts?
 
 
 53
 We find no language in either contract which set any time limit upon the processing of such grievances either during or after the contract term. If we were to imply such a time limit from the fact that the contract itself had a termination date, such an implication would create insuperable difficulties in processing the last grievances through the grievance and arbitration machinery as the end of the contract approached. Obviously, as we shall see, the parties themselves did not so interpret the contract.
 
 
 54
 These grievances were ones which sought compensation to members of the bargaining unit for work allegedly done by salaried personnel in violation of Article XXV, paragraph 3:
 
 
 55
 3. Supervisors or salaried personnel will not perform work on any job within the Bargaining Unit except in cases of emergency, or when no qualified employee is available, or when instructing an employee.
 
 
 56
 In Lincoln Mills, the seminal arbitration case, the Supreme Court held that holdover grievances seeking money damages after the company had terminated operations and contracted to sell its mill properties were nonetheless "continuing controversies." Textile Workers v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957).
 
 
 57
 Bearing on this same issue is the language of the Court in John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1963):
 
 
 58
 It is true that the Union has framed its issues to claim rights not only "now"-after the merger but during the terms of the agreement-but also after the agreement expired by its terms. Claimed rights during the term of the agreement, at least, are unquestionably within the arbitration clause; we do not understand Wiley to urge that the Union's claims to all such rights have become moot by reason of the expiration of the agreement. As to claimed rights "after January 30, 1962," it is reasonable to read the claims as based solely on the Union's construction of the Interscience agreement in such a way that, had there been no merger, Interscience would have been required to discharge certain obligations notwithstanding the expiration of the agreement. We see no reason why parties could not if they so chose agree to the accrual of rights during the term of an agreement and their realization after the agreement had expired. Of course, the Union may not use arbitration to acquire new rights against Wiley any more than it could have used arbitration to negotiate a new contract with Interscience, had the existing contract expired and renewal negotiations broken down.
 
 
 59
 Whether or not the Union's demands have merit will be determined by the arbitrator in light of the fully developed facts. It is sufficient for present purposes that the demands are not so plainly unreasonable that the subject matter of the dispute must be regarded as nonarbitrable because it can be seen in advance that no award to the Union could receive judicial sanction. See Warrior & Gulf, supra, at 582-583, 80 S.Ct. 1347, Id. at 554-555, 84 S.Ct. at 917. (Footnote omitted.)
 
 
 60
 We conclude, as obviously the parties did by their continued processing of the grievances, that the B2 and C2 grievances were viable as of December 4, 1966, when the Memorandum of Settlement was signed.
 
 
 61
 For the same reasons that the District Judge held the B1 and C1 grievances arbitrable (with our full affirmance earlier in this opinion), we now hold that the B2 and C2 grievances were arbitrable as of December 4, 1966.
 
 
 62
 This leaves the remaining question as to whether the December 4, 1966, Memorandum of Settlement represented an agreement of the parties to terminate the B2 and C2 grievances.
 
 
 63
 There is a strong dispute of background facts and interpretation as to what paragraph 4 of the Memorandum of Settlement of December 4, 1966, meant to the parties to the contract in relation to the 1960-63 grievances. The District Judge originally (and we believe correctly) held that paragraph 4 was susceptible of two logical constructions: that urged by the union, and that urged by the company. He thereupon held an evidentiary hearing and resolved some of the fact problems bearing on construction of the Memorandum of Settlement.
 
 
 64
 We believe that it is clear and essentially undisputed (and the District Judge so found) that the "grievance backlog" referred to in the first part of paragraph 4 did refer to a total of some 3,600 grievances, among which were "holdover" grievances from the 1960-63 contract period. We believe that it is also undisputed (and the District Judge so found) that 1960-63 grievances were discussed and some of them were settled in the negotiations following the Memorandum of Settlement between December 4, 1966 and April 3, 1967.[2]
 
 
 65
 It is, we think, clear that the references in the first part of paragraph 4 to "grievance backlog" and "active grievances at 2nd, 3rd and 4th steps on December 4, 1966" included the 1960-63 "holdover" grievances. The question then arises as to what interpretation should be given to the later provisions of paragraph 4:
 
 
 66
 Such grievances as may remain unsettled after consideration by the Committee will be categorized by the Committee into one of the following categories:
 
 
 67
 A. Grievances which are (1) arbitrable as a matter of right under the terms of the 1963-1966 collective bargaining agreement and as to which either party will determine whether it desires to proceed to arbitration and
 
 
 68
 (2) arbitrable under the 1963-1966 agreement by mutual agreement.
 
 
 69
 B. Grievances which would constitute a contract violation but which are deemed to be non-arbitrable by the Company under the terms of the 1963-1966 Agreement. The Union will determine whether or not they wish to strike or proceed in court on such grievances under the terms of Section 301 of the Taft Hartley Act.
 
 
 70
 C. Non-contractual grievances.
 
 
 71
 Should any of such grievances be issues upon which the Union elects to strike, it shall give ten days notice thereof to the Federal Mediation and Conciliation Service. The Company should be simultaneously notified. The grievance backlog program shall be conducted during the period January 3, 1967 through April 3, 1967, at the end of which period the Special Grievance Committee will be dissolved, and all matters connected with the issue of backlog of grievances shall be deemed settled for all purposes, excepting only such arbitration proceedings initiated or court actions which may have been filed, or any non-contractual grievances in mediation, or where notice of intent to strike has been given.
 
 
 72
 The company's interpretation of the language "under the terms of the 1963-66 collective bargaining agreement" is that it was designed to exclude the 1960-63 grievances.
 
 
 73
 The union's position is that the paragraph 4 language just quoted above was employed to describe the standard by which the arbitrator would determine arbitrability.
 
 
 74
 We think the District Judge erred in undertaking to resolve this conflict. We certainly cannot say "with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." Thus under the prescription given us by the Supreme Court in United Steelworkers v. Warrior & Gulf Navigation Co., supra at 582, 80 S.Ct. 1347, these "holdover" grievances must be referred to arbitration in lieu of resolution in the federal court. As to this issue the District Court is reversed.
 
 
 75
 The judgment of the District Court is affirmed in part and reversed in part, and remanded for further proceedings consistent with this opinion.
 
 
 
 [1]
 This same ruling would be applicable to the grievances of the C1 class but for the fact that the company chose not to appeal the District Judge's order to arbitrate as to them
 
 
 [2]
 We note that the District Judge failed to resolve a dispute of fact as to whether this very issue (the survival of the 1960-63 grievances) was (as claimed by the company) discussed by the negotiators with the company's interpretation of paragraph 4 being stated by its chief negotiator at the December 4, 1966, meeting or whether, as claimed in union testimony, no such issue was ever raised or talked about