NASHVILLE NEWSPAPER PRINTING
PRESSMEN'S UNION,
LOCAL 50

v.

NEWSPAPER PRINTING COR-
PORATION.

No. 74–172–NA–CV.

United States District Court,
M. D. Tennessee,
Nashville Division.

July 19, 1974.

Robert J. Martin, Jr., Atlanta, Ga., Hugh C. Howser, Nashville, Tenn., for plaintiff.

Stafford McNamee, Jr., Bass, Berry & Sims, Nashville, Tenn., for defendant.

## MEMORANDUM

MORTON, District Judge.

This matter came on for trial on July 2, 1973, before this Court. The evidence submitted is documentary and no witnesses testified. The complainant Union seeks to compel arbitration of future contract terms and of a grievance which was filed on November 13, 1973, over contract interpretation. The respondent Company contends that there is no jurisdiction in the Court, that arbitration of future terms is contrary to our national labor policy, and alternatively, that the collective bargaining agreement expired on December 31, 1972, and as a result the Company is not obligated to arbitrate future terms or grievances arising after said date.

*Findings of Fact*

### II

*Parties*

Complainant Nashville Newspaper Printing Pressmen's Union No. 50, is an unincorporated labor organization within the meaning of the Labor-Management Relations Act, representing employees engaging in and affecting interstate commerce in Nashville, Davidson County, Tennessee; Newspaper Printing Corporation is a Tennessee corporation having its principal place of business in Nashville, Davidson County, Tennessee, and is an employer within the meaning of the Labor-Management Relations Act.

### III

*Terms of the Collective Bargaining Agreement*

The complainant Union and respondent Company entered into a collective bargaining agreement on May 15, 1970, which was to be retroactive to January 1, 1970. The introduction and paragraph one of the Contract states:

THIS AGREEMENT, made this the [15th] day of [May], 1970, by and between the Newspaper Printing Corporation, Agent for the Tennessean Newspapers, Inc., and the Nashville Banner Publishing Company, Publishers of two daily newspapers in the City of Nashville, Tennessee, the parties hereinafter called the Publishers, the party of the first part, and the Nashville Newspaper Printing Pressmen's Union, Local 50, subordinate to the International Printing Pressmen and Assistants' Union of North America, through their authorized representatives, the second party, hereinafter called the Union.

### WITNESSETH:

WHEREAS, the parties to this agreement desire to establish and maintain harmonious relations between themselves as employer and employee, and to provide methods for considering and settling whatever disputes may arise between them; therefore, in consideration of the mutual promises herein made, it is agreed as follows:

## ARTICLE I

This contract and scale of wages shall, unless changed by mutual consent, be in effect from January 1, 1970, through December 31, 1972, and thereafter within the limitations hereafter set forth. If either party hereto wishes to propose an amendment to this contract or a new contract to take the place of this one upon its expiration date it shall notify the other party in writing of its wishes sixty (60) days prior to January 1, 1973, and accompany the notice with statement in detail of changes desired. The respondent party may within thirty (30) days formulate and present a counter-proposal setting forth the conditions it will seek to establish. If no counter-proposal be filed, the existing contract shall be considered to be the respondent party's counter-proposal. If notice is not given by one of the parties, as above described, it shall be construed as a renewal of this agreement for one year and the contract shall thereafter run from year to year until opened for negotiations by the procedures above described, it being understood that the renewal shall be by negotiations in a conciliatory spirit, and if no agreement is made in that manner, then by arbitration. In either event there shall be a continuous operation of the presses and a continuous and uninterrupted friendly relationship between the parties to this agreement, and all matters of dispute not specifically set forth herein shall be settled in accordance with the arbitration provisions hereinafter set forth.

The collective bargaining agreement also has a very broad arbitration provision which in pertinent part provides:

*Section 1.* The parties to this agreement agree that all disputes affecting wages, hours, working conditions, and shop practices that may arise between them will be settled by conciliation and in the event conciliation fails, then by arbitration as provided for below.

*Section 2.* In the event of a difference arising between the Publishers and the Union, parties to this agreement, all work shall continue without interruption pending proceedings looking to conciliation or arbitration, and the scale and hours provided herein as well as the working conditions prevailing at the time the difference arose, shall be preserved unchanged until a final decision of the matter at issue shall have been reached.

*Section 3.* A Standing Committee of two representatives selected by the Publishers and two representatives selected by the Union, shall be appointed, and in case of a vacancy, absence or refusal of either of such representatives to act, another shall be appointed in his place. To this committee shall be referred all disputes which may arise as to scale of wages hereto attached, to construction to be placed upon any clause of the agreement, or alleged violations thereof, which cannot be settled otherwise, and such joint committee shall meet when any question or difference shall have been referred to it for decision by the executive officers of the parties to this agreement. Should the Joint Committee be unable to agree, then it shall refer the matter to a Board of Arbitration, the representatives of each party to this agreement select two arbiters, and the four to agree upon a fifth.

The Agreement also has a no strike clause:

*Section 1.* It is agreed by the parties hereto that during the life of this contract, there shall be no strike or other concerted action upon the part of the Union in contravention of the provision of this contract; and there shall be no lockouts during said period; it being understood that all parties shall work in harmony for the promotion of the interest of the newspaper in the publication of which, all

parties hereto recognize a community of interest. (Complaint, Exhibit No. 1.)

## IV

### Contract Opening

By letters dated November 1, 1972 both parties gave the other notice of an intention to amend the contract (Complaint, ¶ 10, and Answer, ¶ 9). The Union wrote to the Company stating in part:

This is to notify you that we are opening our contract which expires December 31 of this year.

\* \* \* \* \* \*

I am enclosing a list of changes we wish to make in our contract. (Emphasis by the Court; Stipulation Exh. No. 2.)

The Company wrote the Union:

As you know, our collective bargaining agreement expires December 31, 1972 and *it requires any party desiring changes or alterations therein to give sixty days written notice.* We hereby notify you that we wish to meet to negotiate *modifications in certain provisions of the collective bargaining agreement, now in effect.* We have received your proposal of the detailed changes desired and are currently preparing a counter-proposal setting forth the conditions we seek to establish. (Emphasis by the Court; Stipulation Exh. No. 1.)

## V

### Request for Arbitration of Future Terms

The parties met on the various Union and Company proposals but to this date have failed to come to a complete agreement on the proposed modifications to the Contract. By letter dated July 19, 1973, the Union wrote the Company, noted that no more meetings had been scheduled to negotiate on the proposed modifications, and stated:

Pursuant to Article II, Section 1 and 2 we hereby call upon you to submit this dispute to conciliation. (Stipulation Exh. No. 5.)

By letter dated August 7, 1973 the Company responded to the July 19, 1973 request for conciliation and stated:

We are fully agreeable to conciliation and agree that *our contract* requires it as the second step in resolving differences. (Stipulation Exh. No. 6.)

Before receipt of the above letter the Union prepared and sent to the Company a request for arbitration which was dated August 2, 1973, and stated:

In accordance with Article I of the Agreement between the parties, and the Code of Procedure of the International Arbitration Agreement, Nashville Newspaper Printing Pressmen's Union, Local 50 hereby requests arbitration of the "propositions originally submitted by the parties to each other upon which agreement has not been reached."

Both parties submitted proposed modifications and amendments to the existing Agreement before its December 31, 1972 terminal date. Some fifteen (15) negotiation sessions have been held, and seven months have passed. Since no agreement has been reached, the Union membership has determined that it has no alternative but to exercise its right to have the unresolved questions settled by arbitration. (Stipulation Exh. No. 7.)

The Company responded to this request immediately stating in pertinent part:

I am somewhat confused by your two recent requests which seem to be contradictory. Your letter of July 19, 1973, requested conciliation of the the [sic] differences that exist. The company is willing to conciliate the new contract terms and has made this known in the negotiation sessions and confirmed this position in a recent letter. *The agreements between the parties make it clear that conciliation*

*must precede arbitration.* Now we are in receipt of your letter demanding arbitration when we have not yet entered into conciliation.

My reading of *our agreements* make it clear that local arbitration begins only after all other attempts at negotiation and conciliation fail. We do not agree that the differences have reached the point where they are ready for consideration by a local board of arbitration. We are perfectly agreeable to conciliation of new contract terms and conditions and in the event conciliation fails, *we will follow the arbitration procedure.* (Emphasis by the Court; Stipulation Exh. No. 8.)

The complainant Union agreed to meet with the respondents in conciliation and did in fact have such a meeting scheduled on November 12 and 13, 1973, in the offices of the Federal Mediation and Conciliation Service in Nashville, Tennessee. No agreement was reached on future terms of the collective bargaining agreement.

## V

*Subsequent Contract Disputes and Requests for Arbitration of Grievances*

During this period of time (after the stated expiration date of the Contract) the parties continued their relationship and both parties continued to assert rights under the collective bargaining agreement. Thus on September 10, 1973, the Company wrote the Union a letter which stated:

I understand that we had another unfortunate incident in the Press Room last week. If my information is correct, your chairman refused to let a straight time employee cover a shift Friday and insisted that the shift be covered by an overtime employee. * * * I believe that you will agree that *our contract has again been violated in this instance.*

Because of this incident, we are today insisting that our foreman *exercise the rights granted under Article VIII,* *Section 3 of our agreement* and not hire overtime shifts if straight time shifts are available. We would appreciate it if you would discuss this matter with your chairmen so that further incidents of forced overtime will be avoided. (Emphasis by the Court; Stipulation Exh. No. 9.)

Again on September 18, 1973, the Company wrote the Union relative to a "violation of the contract" stating:

We must protest your Union's actions on September 14, 1973 when for the second successive Friday a straight time employee was not hired so as to allow an overtime employee to cover the shift. The company *requests a meeting of the Joint Standing Committee* to consider this matter, which we believe is a *clear violation of the contract,* and requests reimbursement for the additional expense of overtime premium pay which resulted from these contract violations.

We are still operating about twenty journeymen short of covering the obligation set forth in the current manning table. We again request that you provide the additional journeymen that you have contracted to provide. The company will cooperate in the effort to locate and employ the required journeymen. (Emphasis by the Court; Stipulation Exh. No. 10.)

The Union likewise sought to enforce its rights under the Contract and by letter dated November 13, 1973 filed a grievance which stated:

The Publishers violated Article IV, Section 6, and other contract conditions by directing the Chairman to mark up as journeymen seven new employees who have not met the apprenticeship requirements of the Agreement and who have not been advanced to journeymen status by the Union. The Union demands the removal of these employees from journeymen situations, and requests that those regular journeymen employees who should have received the markups in question

be made whole for all wages lost. (Stipulation Exh. No. 11.).

The Company replied to the grievance in writing setting forth in detail its position under the Contract:

We have received your letter of November 13, 1973, in which you allege that the Publishers have violated Article IV, Section 6, and other contract conditions. We do not know what the other contract conditions are, but our reading of Article IV, Section 6, restricts it to the apprenticeship program. As you know, we have never applied the apprenticeship section to journeymen seeking work. The application of Article IV, Section 6, has been to training persons to become journeymen.

. . . Admittedly, it is regrettable that you chose not to furnish the additional pressmen required by the Publishers and chose to ignore the contractual obligation under Article VI, Section 2. (Stipulation Exh. No. 12.)

By letter dated December 21, 1973 the Union requested arbitration of the Article IV, Section 6, dispute:

At our joint standing committee meeting on November 30, 1973 the grievance filed by the Union on November 13, 1973, protesting the marking-up of seven new employees on journeyman situations, was discussed. After discussion, the Publisher's members of the joint standing committee still refused to concede that the Union grievance was meritorious. Thus, the joint standing committee was unable to agree on the dispute.

In accordance with Article II, Section 3, of the Agreement, the Union hereby refers the dispute to a Board of Arbitration. The Union's members of the Board are Robert L. Breedlove and Delbert A. Tichenor.

Will you kindly advise the undersigned within five (5) days of the names of the two Publisher representatives who will be ready to proceed to jointly select a fifth member of the Board to serve as impartial chairman. (Stipulation Exhibit No. 13).

## VI

### Refual to Arbitrate by Company

By letter dated January 4, 1974, the attorney representing the Union wrote to the Company recounting in large part the correspondence between the parties and requesting that the Company take steps to proceed with arbitration.[1] The Company responded to this letter and refused to arbitrate both the future terms dispute and the grievance over Article IV, Section 6 of the Contract. The letter stated:

"This letter will acknowledge receipt of your letter of January 4, 1974, and letters from Delbert Tichenor of December 21, 1973, and January 6, 1974, all of which request arbitration of one kind or another.

". . . I would like to relate to you the positions of the parties in this situation as I have understood them from that time. On November 1, 1972, Mr. O. B. Fuson, secretary of the Local, in his '60-day notice' referred to 'our contract which expires December 31 of this year'. In the notice to FMCS, Mr. Fuson said: 'Our letter of November 30, 1972, confirmed the expiration with the following statement: 'sets forth the conditions we will seek to establish at the expiration of our current collective bargaining agreement'. Both parties have been in total agreement that the contract expired December 31, 1972, and with its expiration any and all ob-

1. At a meeting held in the offices of the Federal Mediation and Conciliation Board the attorney representing the Union had given the Company representative a list of arbitrators (Request for Admission No. 12). The letter of the Union attorney indicates that he did not hear from the Company, had attempted to reach Company representatives subsequently to no avail. Hence the letter.

ligations either party had under the contract were terminated. Since that time there have been no discussions or understandings that relate to extending the contract which expired December 31, 1972, and the parties have been operating without a contract since that date. The Company feels no obligation to arbitrate grievances or the terms and conditions of a new contract, since its contractual obligations and those of the Local were terminated December 31, 1972.

## VII

### Other Considerations

By affidavit the Company contends that it was not the intention of the parties to arbitrate future terms or grievances filed after December 31, 1972. (Affidavit of Ralph Saunders). The Court rejects this evidence because it merely indicates the unexpressed unilateral intention of one of the parties. Further, the statement is impeached by the letters written by the affiant in which the Company sought to enforce its rights under the contract subsequent to December 31, 1972, and by his letter of August 8, 1973 (Stipulation Exhibit No. 8) in which he contended the contract required arbitration.

Further, in 1950, pursuant to a contract with the exact wording of this contract,[2] the parties did arbitrate future terms when the contract was reopened and the parties could not agree on the requested modification. (Union Exhibits No. 2 and 3).

## CONCLUSIONS OF LAW

### I

### APPLICATION OF THE PRESUMPTION OF ARBITRABILITY TO INTEREST DISPUTES

 It is clear that the policy of the United States is in favor of voluntary adjustment of disputes between labor and management. *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 923, 1 L.Ed.2d 972 (1957); *United Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers v. Warrior and Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. Enterprise Wheel and Car Corporation*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). This policy is soundly grounded in congressional mandate. *Gateway Coal Co. v. United Mine Workers of America*, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974). While all of the cases before the Supreme Court which establish the presumption in favor of arbitration of labor-management disputes have involved grievance arbitration rather than interest or contract arbitration, this certainly does not indicate that the presumption in favor of arbitrability does not apply to interest arbitration. The arbitration of disputes is clearly "a substitute for industrial strife" and industrial strife can be caused just as readily, if not more so, by disputes involving "interests" or "contract" matters as by grievances. There is no basis for a distinction in this regard. More importantly, the Labor Management Relations Act provides that it is the policy of the United States that "the settlement of issues between employers and employees through collective bargaining may be advanced by making available . . . voluntary arbitration to aid and encourage employers and the representatives of their employees *to reach and maintain* agreements concerning rates of pay, hours, and working conditions . . . ." LMRA § 201(b). Other courts which have considered the question of whether the doctrine favoring arbitrability applies to interest or contract arbitration have clearly indicated affirmatively. *Winston-Salem Print-*

---

2. The only difference is the inversion of the introductory paragraphs. The contract was attached to a copy of the Company's brief in that arbitration, which was introduced into evidence (Union Exhibit No. 2).

*ing Press. & A. U. v. Piedmont Publishing Co.,* 393 F.2d 221 (4th Cir. 1968); *Division No. 892, etc. v. M.K. & O. Transit Lines,* 210 F.Supp. 351 (N.D. Okl.1962), reviewed on other grounds, 319 F.2d 488 (10th Cir. 1963), cert. denied, 375 U.S. 944, 84 S.Ct. 350, 11 L. Ed.2d 274 (1963); *Builders Association of Kansas City v. Greater Kansas City Laborers,* 326 F.2d 867 (8th Cir. 1964), cert. denied, 377 U.S. 917, 84 S.Ct. 1128, 12 L.Ed.2d 186 (1964); *Seltzer & Co. v. Livingston,* 253 F.Supp. 509 (S.D.N.Y. 1966), aff'd, 361 F.2d 218 (2nd Cir. 1966); *Chattanooga Mailers Union Local No. 92, etc., v. The Chattanooga News-Free Press Company, etc.,* (E.D. Tenn.1974). All of the foregoing cases have clearly rejected the rationale of the cases of *Boston Printing Pressmen's Union v. Potter Press,* 141 F.Supp. 553 (D.Mass.1956) aff'd 241 F.2d 787 (1st Cir. 1957) and *Austin Mailers Union v. Newspapers, Inc.,* 226 F.Supp. 600 (W.D.Texas 1963) aff'd 329 F.2d 312 (5th Cir. 1964), which are the only cases which the Company relies upon in this case, and for the same reasons this Court does likewise. The Court will apply the *Warrior* rule to the question of whether the Company must arbitrate the future terms dispute.

## II

### ROLE OF THE COURT

 There is no question that the Court has jurisdiction to consider whether the collective bargaining agreement contains terms which bind the parties to arbitrate their disputes. *Western Automatic Screw Co., Div. of Standard Screw Co. v. International Union, United Auto, etc.,* 335 F.2d 103 (6th Cir. 1964); *Local 19, Warehouse Processing & Distributive Workers Union, etc. v. Buckeye Cotton Oil Co.,* 236 F.2d 776 (6th Cir. 1956), cert. den. 354 U.S. 910, 77 S.Ct. 1293, 1 L.Ed.2d 1428; *Totton v. United Assoc. of Journeymen & Apprentices, etc.,* 293 F.Supp. 673 (E.D.Tenn.1968), aff. 402 F.2d 270, cert. den. 393 U.S. 915, 89 S.Ct. 239, 21 L.

Ed.2d 200; reh. den. 393 U.S. 1046, 89 S.Ct. 612, 21 L.Ed.2d 599. In deciding that issue, the Court must apply a strong presumption in favor of arbitration. In *United Steelworkers v. Warrior and Gulf Nav. Co., supra,* the Court stated:

"The Congress, however, has by § 301 of the Labor Management Relations Act, assigned the courts the duty of determining whether the reluctant party has breached his promise to arbitrate. For arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit. Yet, to be consistent with congressional policy in favor of settlement of disputes by the parties through the machinery of arbitration, the judicial inquiry under § 301 must be strictly confined to the question whether the reluctant party did agree to arbitrate the grievance or did agree to give the arbitrator power to make the award he made. An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." 363 U.S. at 581–3, 80 S.Ct. at 1353.

\* \* \* \* \* \*

"In the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail, particularly where, as here, the exclusion clause is vague and the arbitration clause quite broad. Since any attempt by a court to infer such a purpose necessarily comprehends the merits, the court should view with suspicion an attempt to persuade it to become entangled in the construction of the substantive provisions of a labor agreement, even through the back door of interpreting the arbitration clause, when the alternative is to uti-

lize the services of an arbitrator." 363 U.S. at 584–585, 80 S.Ct. at 1354.

These principles are likewise applicable here and the argument of the Company that the contract may never come to an end has no validity. This argument was considered and rejected in *Winston-Salem Printing Press. & A. U. v. Piedmont Publ. Co., supra*:

> No compelling reason for disregarding the specific provision to arbitrate a new contract in the instant case has been brought to our attention. The Company argues that if courts enforce this type of arbitration, "there would never be and there could never be an end to this contract." The Company, professing solicitude for the employees vis-a-vis the Union, further insists that under the District Court's ruling, "the printing and pressmen employees of the Company are bound to this Union with hoops of steel which deprive them forever of the right to terminate this Union as their bargaining representative." Neither argument is persuasive nor do they together outweigh what we conceive to be the national labor policy of strictly enforcing collective bargaining agreements and thereby compelling the parties to resolve peacefully all labor disputes by their previously agreed method.

> Contrary to the Company's assertions, the contract will surely end when both parties agree to terminate it and in some instances when either of the original signatories is removed from the scene. See *John Wiley & Sons, Inc. v. Livingston, supra* [376 U.S. 543] at 551–555, 84 S.Ct. 909 [11 L. Ed.2d 898]; Cox and Bok, Cases and Materials on Labor Law, 314–317 (6th ed. 1965). Then too, as the material referred to in Cox and Bok indicates, the employees are not bound "with hoops of steel" but can, upon the filing of a timely petition within the guidelines of the "contract bar rules," designate a new bargaining representative.

The second point is, we believe, the more significant of the two. As long as employees retain their full freedom to choose or dismiss their bargaining representative, it is immaterial that the contract might be of indeterminate duration—if that is what the parties bargained for. We must assume that either the parties mutually agreed on this provision from the start or that one of the parties secured it during the give and take of the collective bargaining. In either case, as long as it is not against the national labor policy, which it certainly is not, it is entitled to enforcement along with any other provision agreed upon by the parties. Nothing would be more out of step with our national labor policies than for courts to refuse to enforce a voluntary agreement to arbitrate differences.

A provision to arbitrate when agreement upon a new contract proves impossible, as in the case here, is part of an existing agreement and refusal to comply therewith constitutes a breach. This court is not asked to determine the provisions of a new contract or to perform any non-judicial function. The drawing of the new contract will be in the hands of an arbitrator where the parties chose to place the authority and responsibility. The court is asked to do no more than enforce a provision of an existing contract, a traditional judicial function. 393 F. 2d at 226–227.

The Court's role is very limited in this case and it is to look at the collective bargaining agreement, determine if it is susceptible of an interpretation that would cover the asserted disputes, resolving doubts in favor of coverage.

## III

### *ARBITRATION OF THE FUTURE TERMS DISPUTE*

There is clearly no intent in this contract to exclude future terms from arbitration. The introduction states that the agreement is "to provide methods

for considering and settling *whatever* disputes may arise" between the parties to the contract. The contract provides a procedure to propose amendments or a new contract upon the end of the stated term.

It goes on to state that "it being understood that the renewal shall be by negotiations in a conciliatory spirit, and if no agreement is made in that manner, *then by arbitration.*" It further states "all matters of dispute not specifically set forth herein shall be settled in accordance with the arbitration provisions set forth." In Article II, Section 1, it is stated:

"The parties to this agreement agree that *all disputes* affecting wages, hours, working conditions, and shop practices that may arise between them will be settled by conciliation and in the event conciliation fails, then by arbitration as provided for below."

There is no question that the above provisions are quite broad and specifically contemplate that the amendment, changes, or new agreement proposed is to be submitted to arbitration if the proposals of either of the parties cannot be settled by negotiation or conciliation.

This is further buttressed by the statements contained in the correspondence between the Company [3] and the Union. The Company indicated that it wished to "negotiate modifications" (Stipulation Exh. No. 1) and the Union said it was "opening" the contract. Both letters indicate only a limited reopening of the contract. More important is the Company's interpretation of the contract upon demand of the Union for arbitration of the "propositions originally submitted by the parties to each other upon which agreement has not been reached":

"My reading of our agreements make it clear that local arbitration begins

only after all other attempts at negotiation and conciliation fail. We do not agree that the differences have reached the point where they are ready for consideration by a local board of arbitration. We are perfectly agreeable to conciliation of new contract terms and conditions and in the event conciliation fails, we will follow the arbitration procedure." (Stipulation Exh. No. 8.)

The Company clearly indicated that its interpretation of the contract was that it contemplated arbitration of future terms. It is also worthy of note that under the same contract language, future terms and wage arbitration was held in 1950 by the parties to this contract.

■ The Court holds that the Company clearly agreed to arbitrate future terms and orders the arbitration of all matters in dispute which were covered by the proposals and counter-proposals of the parties in their letters of November 1, 1972 and November 30, 1972.

IV

### THE ARTICLE IV, SECTION 6, GRIEVANCE

This grievance is clearly one subject to arbitration under the contract. However, the Company takes the position that since it arose after December 31, 1972 it is not obligated to arbitrate since the contract ha₀ expired. This question of expiration is one which is involved with the "law of the shop." The contract clearly says that it is in effect "through December 31, 1972 *and thereafter within the limitations hereinafter set forth.*" The contract then continues to set forth procedures for amendment or proposal for a new contract. Here it is clear from the pleadings and the notices that amendments to

---

3. We note that the Company is represented by only one person in the matter of labor relations. This individual wrote all of the letters in this case and presented the Court with an affidavit.

the contract were presented by both parties. The contract then states:

"In either event there shall be a continuous operation of the presses and a continuous and *uninterrupted* friendly relationship between the parties to this agreement, and *all matters of dispute* not specifically set forth herein shall be settled in accordance with the arbitration provisions hereinafter set forth."

Article II, Section 2, of the contract provides for the maintenance of the status quo pending arbitration:

In the event of a difference arising between the Publishers and the Union, parties to this agreement, all work shall continue without interruption pending proceedings looking to conciliation or arbitration, and the scale and hours provided herein as well as the working conditions prevailing at the time the difference arose, shall be preserved unchanged until a final decision of the matter at issue shall have been reached.

 It is apparent that the question of whether the contract is in existence and whether it continues is one primarily of contract interpretation. It will also be influenced to a great extent by the actions of the parties, especially the attempt by the Company to enforce its rights under the contract after the Company's alleged expiration date, and the prior history of past wage arbitration.[4] The dispute is certainly one that does not arise in a vacuum.

 The arbitration clauses in this contract, as stated before, are broad, using language such as "whatever disputes

may arise between them;" "all matters of dispute not specifically set forth herein;" "all disputes affecting wages, hours, working conditions, and shop practices;" and, "in the event of a difference arising between the parties." Under *Warrior* this language must be construed liberally. The Supreme Court recently reaffirmed this policy in the case of *Gateway Coal Co. v. United Mine Workers*, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974) where the language of the agreement[5] was similar to the language in this case. Under these circumstances and the fact that this language has been in this contract in substantially the same form since 1932,[6] it would be improper for the Court to apply its interpretation to the meaning of the contract. *International Union, UAW v. General Electric Co.*, 474 F.2d 1172 (6th Cir. 1973); *Detroit News. Pub. Ass'n. v. Detroit Typo. Union No. 18, etc.*, 471 F.2d 872 (6th Cir. 1972); *Timken Co. v. Steelworkers*, 492 F.2d 1178 (6th Cir. 1974); *International Ass'n of Machinists v. Howmet Corp.*, 466 F.2d 1249 (9th Cir. 1972). Certainly in the period of time that the provisions have been in existence "shop practices" have developed which are incorporated into the law of the shop to which an arbitrator is best able to bring his competence. In the *Winston-Salem Printing Press. & A. U. v. Piedmont Publ. Co., supra*, case, the Fourth Circuit was presented with the same problem in the same industry. The trial judge had interpreted the contract and the Court made the following observation:

This court intimates neither agreement nor disagreement with the trial

---

4. In the Company's brief in the 1950 future terms arbitration it was stated that pressroom operations were continuing under the terms of the contract pending the arbitrator's decision. (Un.Exh. 2, p. 2.)

5. The language there covered disputes "as to the meaning and application of the provisions of this agreement" and "disputes 'about matters not specifically mentioned in this agreement' and 'any local trouble of any kind

aris[ing] at the mine.'" It further stated "all disputes and claims which are not settled by agreement shall be settled by" arbitration. See 414 U.S. at 375, 94 S.Ct. at 635.

6. Counsel for the Company made this undisputed statement in oral argument. He stated that the notice provisions were added after the enactment of the Labor-Management Relations Act in the 1940's.

judge's construction of Section 15 of the original contract, for in our view this particular issue involves an interpretation of the contract which should be determined independently by the arbitrator. The contract specifically provides that "the construction to be placed upon any clause of this agreement" is to be resolved through the grievance procedure incorporated therein, and we can see no reason why that provision should not govern the construction to be given Section 15. In support of its position, the Union points out that this type of contract has been employed in the industry for over thirty years. If so, who is better qualified to determine the intent of the parties than an arbitrator chosen because of his knowledge of the customs and practices of the industry? 393 F.2d at 228.

Article II, Section 3, of this contract likewise clearly states that "all disputes . . . to construction to be placed upon any clause of the agreement" are to be referred to the joint standing committee, then to arbitration. Under these circumstances the Union "should not be deprived of the arbitrator's judgment, when it was his judgment and all it connotes that was bargained for." *United Steelworkers v. American Mfg. Co.*, 363 U.S. at 568, 80 S.Ct. at 1346 (1960).

The Court therefore refers the question of the continuing effect of the contract and the Article IV, Section 6, grievance to arbitration. If the contract has continuing validity then all disputes, including the Article IV, Section 6, dispute, will be subject to arbitration.

### V

### ATTORNEYS FEES AND EXPENSES OF LITIGATION

Since there is a conflict in the judicial decisions as to compulsory arbitration of interest disputes, no attorney fees will be awarded. However, the costs normally allowed to a successful plaintiff will be paid by the defendant.

An appropriate order will be entered.